STATE of Wisconsin, Plaintiff-Respondent,

v.

Steven A. AVERY, Defendant-Appellant.†

Court of Appeals

*No. 2010AP411–CR. Submitted on briefs April 26, 2011.
—Decided August 24, 2011.*

**2011 WI App 124**

(Also reported in 804 N.W.2d 216.)

† Petition for Review denied 12-14-11.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Suzanne L. Hagopian* and *Martha K. Askins*, assistant state public defenders of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jeffrey J. Kassel*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶ 1. NEUBAUER, P.J. Steven Avery was convicted as a party to the crime of the first-degree intentional homicide of Teresa Halbach. He was also convicted of being a felon in possession of a firearm. Avery challenges his convictions on three grounds. Avery first argues that the trial court erred in denying his motion to suppress evidence resulting from the sixth search of his trailer home. We conclude that this search, conducted three days after the search warrant was issued, constituted a reasonable continuation of the original search and that the evidence was otherwise admissible under the inevitable discovery doctrine.

¶ 2. Next, Avery argues that the trial court erred in barring his presentation of third-party liability evidence. We uphold the trial court's ruling. The third-party liability evidence proffered by Avery identified a large group of individuals who he claimed were near the

359

Avery property on the date of Halbach's murder but who he acknowledged had no motive to harm her. This evidence failed to satisfy the "legitimate tendency" test under *State v. Denny*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984), and was properly deemed inadmissible.

¶ 3. Finally, Avery contends that the trial court's excusal of a deliberating juror violated his fundamental rights and that the trial court erred in denying his postconviction motion for a new trial on this ground. Avery additionally contends that if he is deemed to have consented to the excusal of the juror, he is entitled to relief due to ineffective assistance of counsel or in the interest of justice. We reject Avery's challenges. We affirm the judgments of conviction and postconviction order.

## BACKGROUND

¶ 4. Avery was charged on November 15, 2005, with first-degree intentional homicide and mutilation of a corpse. The complaint was later amended to include possession of a firearm by a felon. The charges related to the October 31, 2005 death of Halbach, a twenty-five-year-old photographer. Halbach's clients included Auto Trader magazine. In the morning of October 31, 2005, Steven Avery called Auto Trader magazine to arrange for Halbach to photograph a vehicle at the salvage yard. Halbach had taken photos of vehicles at the Avery salvage yard on five prior occasions. At the time of her disappearance, it was believed that Halbach was last seen taking photos at Avery's Auto Salvage.

¶ 5. In October 2005, Avery's Auto Salvage was located on a forty-acre piece of property owned by Allan and Delores Avery. Two of their sons, Charles and Steven, lived on the property and worked at the salvage yard business. Another son, Earl, worked at the salvage yard but did not live on the property. Their daughter,

Barb Janda, lived in a trailer on the property with three of her sons, Bobby, Blaine and Brendan Dassey. Janda was dating Scott Tadych at the time. In addition to the various Avery residences, there were other buildings on the salvage yard property, including a business office and garages. One garage was located between the homes of Barb Janda and Steven Avery. The majority of the property consisted of a "pit" containing cars and other salvage items, including a car crusher and a smelter.

¶ 6. Halbach's mother reported her missing on November 3, 2005, and a group of volunteers began searching for her. Volunteer searchers who had obtained permission from Earl Avery to search the Avery salvage yard located Halbach's vehicle, a Toyota RAV4, on the Avery property on November 5. The vehicle was covered with branches, plywood and the hood of another vehicle. The Avery Auto Salvage property was then secured by law enforcement and a search warrant was obtained. The property became the subject of a search conducted from November 5 through 12.

¶ 7. During the course of the search, the police found, among other things, burned bone fragments, including skull fragments, in and around a burn pit behind Avery's garage with DNA consistent with that of Halbach; blood in the front area of Halbach's vehicle that was later determined to have come from Avery; blood in the cargo area of the vehicle that was later determined to have come from Halbach; and remnants of a cell phone, Palm Pilot and camera in a burn barrel in Avery's yard of the same models owned by Halbach. While conducting a sixth search of Avery's trailer on November 8, officers discovered the key to Halbach's vehicle in Avery's bedroom. The key was later determined to have Avery's DNA on it. In a search conducted in March 2006, after Avery had been charged, police

361

recovered a nearly intact bullet and bullet fragments from Avery's garage that came from a rifle found in Avery's trailer and contained DNA belonging to Halbach.

¶ 8.　Avery's case proceeded to trial in February 2007. Prior to trial, Avery unsuccessfully moved to suppress the evidence of the November 8 search of his trailer and also to admit evidence intended to demonstrate that any of his extended family members or customers of the salvage yard could have committed Halbach's murder. At the close of the nearly five-week trial, a jury convicted Avery of being a party to the crime of first-degree intentional homicide and possession of a firearm by a felon.

¶ 9.　Avery filed a postconviction motion on June 29, 2009, requesting a new trial on the grounds that the court improperly excluded third-party liability evidence and improperly excused a deliberating juror. The court denied Avery's motion in a thorough and well-reasoned written decision. Avery appeals that ruling and raises an additional challenge to the trial court's prior denial of his motion to suppress evidence uncovered during the November 8 search of his trailer.

¶ 10.　Additional facts will be recited as they pertain to the issues on appeal.

## DISCUSSION

## I.　The Trial Court Properly Admitted Evidence Recovered During the November 8 Search of Avery's Trailer.

### A.　Background

¶ 11.　The facts surrounding the search of the Avery salvage yard and Avery's residence as found by

the trial court were set forth in its written decision denying Avery's motion to suppress. Between Saturday, November 5, when the original search warrant was issued, and Wednesday, November 9, when the police obtained a new warrant,[1] law enforcement and crime lab personnel entered Avery's trailer on seven occasions. The original warrant authorized a search of Avery's trailer and detached garage, a neighboring trailer and garage, and the forty-acre salvage yard, including outbuildings and vehicles. After the warrant was issued on November 5 at 3:30 p.m., law enforcement conducted a ten-minute sweep search of Avery's trailer and an eight-minute search of his garage, looking for any obvious evidence relating to Halbach's whereabouts. Then, at 7:30 p.m. that same day, law enforcement entered Avery's trailer for a second time. This time the officers stayed just over two and one-half hours and seized approximately fifty pieces of evidence, including some trace evidence.[2] The third and fourth entries occurred on Sunday, November 6, for the purpose of collecting weapons, a vacuum cleaner, and bedding from the spare bedroom and for an initial search by the state crime lab for trace evidence of blood. A fifth entry occurred on November 7, 2005, for the limited purpose of retrieving the serial number of Avery's computer.

---

[1] Pursuant to WIS. STAT. § 968.15(1) (2009–10), a search warrant must be executed and returned not more than five days after the date of issuance. All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

[2] Avery argued before the trial court that this second search constituted a completed execution of the search warrant with respect to his residence. On appeal, he concedes that the three entries following "the full-blown Saturday evening search . . . could be considered a reasonable continuation of the earlier search."

¶ 12. It is the sixth entry into Avery's trailer on Tuesday, November 8, 2005, and the discovery of the Toyota RAV4 key during that search that provides the basis for Avery's challenge. The November 8 search of Avery's bedroom lasted approximately one hour. During the search, one of the officers tipped and twisted a bookcase, pulling it away from the wall. Another officer then noticed the Toyota RAV4 key on the floor of the bedroom.

¶ 13. Avery contends that the trial court erred in admitting the Toyota RAV4 key found in his bedroom during the November 8 search of his trailer. Avery does not dispute that probable cause existed for the warrant. Instead, Avery argues the reentry on November 8 violated his constitutional guarantee against unreasonable searches and seizures. We disagree.

¶ 14. "The Fourth Amendment of the United States Constitution guarantees that persons shall be secure from 'unreasonable searches and seizures and sets forth the manner in which warrants shall issue.' " *State v. Sveum*, 2010 WI 92, ¶ 18, 328 Wis. 2d 369, 787 N.W.2d 317 (citation omitted). It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*Id.* (citing U.S. CONST. AMEND. IV). The constitutional validity of a search and seizure conducted pursuant to a warrant is subject to a two-part inquiry: (1) the Warrant Clause requires that all warrants be validly issued

and (2) the Reasonableness Clause requires that warrants be reasonably executed. *Sveum*, 328 Wis. 2d 369, ¶ 19. As noted, Avery does not challenge the validity of the warrant. We therefore limit our analysis to the second inquiry—the reasonableness of the officers' conduct of the search.

¶ 15. The Reasonableness Clause of the Fourth Amendment is a statement of broad protection against unreasonable searches and seizures. *State v. Henderson*, 2001 WI 97, ¶ 18, 245 Wis. 2d 345, 629 N.W.2d 613. "The determination of reasonableness is made by reference to the particular circumstances of each individual case and balances 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " *Id.* (citations omitted). Constitutional reasonableness relates not only to the grounds for a search or seizure but to the circumstances surrounding the search or seizure's execution. *Id.*

¶ 16. The determination as to whether the November 8 search of Avery's trailer was unreasonable involves a question of constitutional fact that we review under a two-part standard. *See State v. Hughes*, 2000 WI 24, ¶ 15, 233 Wis. 2d 280, 607 N.W.2d 621. We uphold the trial court's findings of historical or evidentiary fact unless clearly erroneous. *Id.* We independently review the trial court's application of constitutional principles to those evidentiary facts. *Id.*

¶ 17. The State defends the November 8 search of Avery's trailer on two grounds. As to reasonableness, the State contends the search was a reasonable continuation of the original search commenced under the November 5 search warrant. Avery agrees that "the

365

'reasonable continuation rule' is the appropriate vehicle for analyzing the multiple entries into his trailer." However, he contends that the search of his bedroom on November 8 for the purpose of seizing items cannot be deemed a "reasonable continuation" of a prior search. In the alternative, the State contends that the key was admissible under the inevitable discovery rule.

## B. Reasonable Continuation

¶ 18. Generally, searches are subject to the "one warrant, one search" rule. *See* 2 Wayne R. LaFave, *Search and Seizure,* § 4.10(d) at 767 (2004). That said, a search conducted pursuant to a lawful warrant may last as long, and be as thorough, as reasonably necessary to fully execute the warrant. *See United States v. Keszthelyi,* 308 F.3d 557, 571 (6th Cir. 2002). Thus, courts have recognized an exception to the "one warrant, one search" rule where a subsequent entry and search are a reasonable continuation of the earlier one. *See id.* at 568. The reasonable continuation rule has two requirements: (1) the subsequent entry must be a continuation of the earlier search and (2) the decision to conduct a second entry to continue the search must be reasonable under the circumstances. LaFave, § 4.10(d) at 768 (citing *Keszthelyi,* 308 F.3d at 569).

¶ 19. The notion of a single search spanning several days was recently addressed in *Sveum,* 328 Wis. 2d 369, ¶¶ 64–72. There, the supreme court considered the reasonableness of a single search warrant authorizing thirty-five days of GPS surveillance on the vehicle of a stalking suspect. *Id.,* ¶ 59. In addressing the defendant's contention that each day of monitoring constituted a separate intrusion requiring a new search

warrant, the *Sveum* court cited with approval *United States v. Squillacote*, 221 F.3d 542, 557 (4th Cir. 2000). *Sveum*, 328 Wis. 2d 369, ¶¶ 65–67. In *Squillacote*, the Fourth Circuit rejected the idea that a new warrant must be obtained for each successive day of searching. *Sveum*, 328 Wis. 2d 369, ¶¶ 65–66. The search warrant in *Squillacote* was issued pursuant to an investigation of suspected espionage-related activities and authorized a ten-day search period. *Squillacote*, 221 F.3d at 554, 557. The court found that, "given the number and type of items that can be evidence of espionage-related activities, the search was necessarily extensive and exhaustive" and "could not have been completed in a single day." *Id.* at 557. Thus, "[u]nder the[] circumstances, the subsequent entries were not separate searches requiring separate warrants, but instead were simply reasonable continuations of the original search." *Id.*

¶ 20. Applying the reasoning in *Squillacote*, the *Sveum* court concluded that "the complex, ongoing nature of stalking justified the 35 days of GPS surveillance on a single search warrant." *Sveum*, 328 Wis. 2d 369, ¶ 67. In doing so, it noted that the stalking statute required the proof of a "course of conduct," and that "[a] search obtaining this type of evidence could not have been completed in a single day." *Id.*

¶ 21. Here, the original search warrant, issued on Saturday, November 5, authorized a search of Avery's trailer and detached garage, a neighboring trailer and garage, and the forty-acre salvage yard, including outbuildings and vehicles.[3] Law enforcement remained on the scene from the time the warrant was issued until

---

[3] The warrant authorized the search for the Toyota RAV4; women's clothing; property belonging to Halbach including, but not limited to, cameras, film and photography equipment, and electronic devices; forensic evidence including, but not limited

367

the search was completed on November 12. The two individuals in charge of the search, Division of Criminal Investigation Special Agent Thomas Fassbender and Inspector Mark Weigert testified at the suppression hearing. Fassbender testified that the initial brief search efforts in the afternoon of November 5 were focused on locating Halbach. Officers again entered Avery's trailer at approximately 7:30 p.m. However, because of the lateness in the day and the weather, the search ended at 10:30 p.m.

¶ 22. Fassbender testified that most of the investigators in the trailer had already been working for twelve hours or more and exhaustion and safety issues were becoming factors that could affect the searchers' ability to locate and collect evidence. In addition, there was "a horrendous rain storm going on" that created a risk of evidence being destroyed or lost as officers went in and out of the trailer to get equipment. Thus, the officers were focused on looking for the type of evidence that would be most at risk of being destroyed under those conditions. Fassbender testified that in debriefing the officers that night, he was telling people: "[W]e are not done in that house." Fassbender testified, as of Saturday night, the trailer "was still part of my scene. This is an ongoing search." In ruling on the motion to suppress, the trial court found that there was no evidence in the record to suggest that Fassbender or Weigert viewed the search of the trailer to have been fully executed following the November 5 entries.[4] *See*

to, fiber evidence, blood, hair, saliva, semen, and fingerprints; instrumentalities capable of taking human life including, but not limited to, weapons, firearms, ammunition, knives, cutting instruments, ropes, and ligatures; and, finally, Halbach herself.

[4] In its written order denying Avery's motion to suppress evidence, the trial court relied on the testimony of Fassbender

WIS. STAT. § 805.17(2) (we will not overturn the trial court's findings of fact unless clearly erroneous).

¶ 23. In addition to Avery's trailer, investigators were dealing with the search of the salvage yard and the approximately 3600 to 3800 junked cars and numerous buildings on the property. On Sunday, November 6, search teams "were accounting for the vehicles, the trunks of vehicles, underneath the vehicles, and the insides of the vehicles; the car crusher, the crushed vehicles . . . the buildings and even maybe starting some of the surrounding areas." That surrounding area consisted of six- to eight-hundred acres of property to be searched, including ponds and lakes. The investigators were also conducting off-site interviews and following up on various leads both on and off the Avery property.

¶ 24. Fassbender testified that because of these other investigative activities, a team was not sent back to Avery's trailer until Tuesday, November 8, to "hopefully do a final, thorough search of that trailer."[5] At that time, the property was still under the control of

and his co-leader, Weigert. The court determined that Fassbender was the "commanding officer" who evaluated the officers' reports and determined future search activities. Thus, the court discounted the testimony of one officer who believed that they had seized everything of evidentiary value as that of a "mere foot soldier." Avery also points to certain arguably ambiguous testimony regarding the completion of the search that night, but Fassbender clarified that it was completed for that night only.

[5] The defendant points to the trial court's reference to testimony that the three officers entered Avery's trailer on November 8 for the purposes of seizing Avery's computer pursuant to a separate search warrant that had been obtained, to take swabs of previously identified blood spots in the bathroom, and to pick up pornographic materials from the bookcase in the bedroom. This ignores the trial court's further acknowl-

law enforcement and the case was still developing.[6] Fassbender confirmed that the evidentiary significance of items observed in the buildings changed during the course of the week. Searches leading up to the November 8 search had uncovered .22 caliber shell casings in Avery's garage and the presence of blood or potential presence of blood in Avery's trailer. In addition, information gathered during interviews indicated that Avery's initial story was inconsistent with later stories and other individuals were contradicting his statements.

¶ 25. Based on our review of the circumstances existing at the time of the November 8 search, we are satisfied that it was a continuation of the ongoing search which commenced on Saturday, November 5. As in *Squillacote*, the number and type of items identified in the search warrant necessitated an extensive and exhaustive search. *See Squillacote*, 221 F.3d at 557. The lateness of the hour, the weather conditions, and the extensive and intensive nature of the search make it apparent that the search of Avery's trailer could not have been completed on November 5. *See id.* Further, the continuous presence of law enforcement at the Avery salvage yard and their continuous control over Avery's trailer from the time of the first search to the

edgement that, according to Fassbender, the officers were also there to "conduct a final, thorough search of the trailer."

[6] When asked why he did not obtain a second warrant for the search of Avery's trailer on November 8, Fassbender responded, "We were still holding that scene. In our estimation, this was ongoing." The November 9 warrant was obtained because of concerns that the November 5 warrant would expire under the five-day statutory limit. *See* WIS. STAT. § 968.15(1).

time of the sixth search belies any argument that the search of Avery's trailer was fully executed at an earlier time.

■

¶ 26. We therefore turn to the second inquiry— whether the decision to conduct another entry into Avery's trailer to continue the search was reasonable under the circumstances. *See Keszthelyi*, 308 F.3d at 569. For the same reasons cited above, we are satisfied that the decision was not only reasonable but necessary, particularly given the evolving information and the accumulation of evidence during the ongoing search. Probable cause had not dissipated during the course of the earlier searches, but rather continued to mount as additional evidence was identified. *See id.* at 572 (continued probable cause is "critical to establishing the reasonableness of the second search").

¶ 27. We uphold the trial court's ruling that "the multiple entries were part of a proper single execution of the November 5, 2005 warrant."[7] To require the government to obtain a new search warrant for the continued search under the circumstances of this case

---

[7] The trial court additionally found that the reasonable continuation analysis permitted the court to consider the site as a whole, given that the warrant authorized the search of the entire salvage yard including the trailer. Because the reasonableness of a multi-day search of the entire site was conceded, the multiple entries into the trailer were deemed a reasonable continuation of the site-wide search. However, we need not reach this issue because we affirm the trial court's determination that reentry of the trailer was a reasonable continuation of the November 5 entry. *See Walgreen Co. v. City of Madison*, 2008 WI 80, ¶ 2, 311 Wis. 2d 158, 752 N.W.2d 687 (noting that when resolution of one issue is dispositive, we need not reach other issues raised by the parties). For the same reason, we need not address the State's harmless error argument.

would be an unjustified burden. *See Squillacote*, 221 F.3d at 558. We turn next to the trial court's alternative basis for denying Avery's motion to suppress, namely that "the evidence would have been inevitably discovered."

## C. Inevitable Discovery

¶ 28. The State contends that even if this court were to find that the November 8 entry into Avery's trailer was unreasonable and constituted a separate search requiring a separate warrant, the evidence resulting from that search, namely the Toyota RAV4 key and resulting DNA evidence, was admissible because it would have been discovered in searches conducted pursuant to the November 9 warrant. In so arguing, the State relies on the inevitable discovery doctrine which provides that the "the fruits of an illegal search nonetheless may be admitted if the tainted fruits inevitably would have been discovered by lawful means." *State v. Schwegler*, 170 Wis. 2d 487, 499, 490 N.W.2d 292 (Ct. App. 1992). The trial court agreed with the State that the inevitable discovery doctrine provided an alternative ground for the admission of evidence discovered during the November 8 search. We likewise conclude that the evidence was admissible under the doctrine of inevitable discovery.

 

¶ 29. In order for the inevitable discovery doctrine to apply, the State must demonstrate by the preponderance of the evidence that the tainted fruits inevitably would have been discovered; in doing so, it must prove:

(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that the leads making the discovery inevitable were possessed by the government at the time of the misconduct; and (3) that prior to the unlawful search the government also was actively pursuing some alternate line of investigation.

*Id.* at 500 (citing *United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir. 1985)). The trial court found that the State had met the requirements. Because the inevitable discovery doctrine is an exception to the exclusionary rule protecting Fourth Amendment interests, *see Nix v. Williams*, 467 U.S. 431, 440 (1984), its application presents a constitutional question which we review de novo, *see State v. Thorstad*, 2000 WI App 199, ¶ 4, 238 Wis. 2d 666, 618 N.W.2d 240.

### 1. Reasonable Probability Existed that Evidence Would Have been Discovered by Lawful Means.

¶ 30. As to the first requirement, the State applied for and received a second warrant on November 9 to inspect Avery's trailer and garage. This pursuit of a second warrant demonstrates that law enforcement would have continued its search of Avery's trailer on November 9 if it had not done so on November 8. By November 8, Halbach's Toyota had been located on the premises, investigators had located shell casings in Avery's garage and possible human blood in Avery's trailer. Then, on Tuesday, November 8, investigators learned that Avery's DNA had been found in Halbach's vehicle and that bone fragments had been discovered in a burn pit behind Avery's garage. Fassbender testified that it had become apparent that Avery was a prime suspect in Halbach's disappearance. These developments, discovered independently of the trailer search

on November 8, convince us that law enforcement would have left nothing unturned in Avery's trailer and, thus, their discovery of the key to Halbach's vehicle was reasonably probable.

### 2. Leads Making Discovery Inevitable Were Possessed by the Government.

¶ 31. As to the second requirement, Avery concedes that the independently developed leads "focused the police on Avery, and may have led them to seek the second warrant on November 9." However, Avery contends that "the inevitability argued by the [S]tate is not the inevitability of discovery, but rather the inevitability that it would focus on Steven Avery as its chief suspect." We disagree. Armed with evidence pointing to Avery's involvement, we are satisfied that the police would have continued the search of Avery's trailer until all areas had been inspected—including that area in between Avery's bed and bookshelf where the key to Halbach's vehicle was discovered. The second requirement is met.

### 3. The Government was Actively Pursuing an Alternate Line of Investigation.

¶ 32. The third requirement requires the State to demonstrate that prior to the November 8 search, it was actively pursuing an alternate line of investigation. *Schwegler*, 170 Wis. 2d at 500. At the pretrial motion hearing, the State argued that it was pursuing alternate lines of investigation at the time of the November 8 search—it was actively searching the forty-acre salvage yard, it was investigating the contents of the burn barrel in the vicinity of Avery's trailer, including the Palm Pilot, camera and cell phone, as well as investi-

gating the discovery of human remains and interviewing various individuals. Avery does not dispute the trial court's finding that "the search of the salvage yard [] yielded the independent leads pointing to the defendant [that] would constitute an 'alternative line of investigation.'" Instead, Avery argues that the third requirement is not met because the State was not pursuing a second search warrant at the time the vehicle key was discovered. Neither the facts nor the law supports Avery's contention.

¶ 33. Avery relies on this court's holding in *State v. Pickens*, 2010 WI App 5, 323 Wis. 2d 226, 779 N.W.2d 1, that the inevitable discovery rule requires "that the police be actively pursuing the legal alternative—here, a warrant—prior to the unlawful search." *Id.*, ¶¶ 47–49. At issue in *Pickens* was whether evidence discovered during an illegal search of a hotel safe was admissible under the inevitable discovery doctrine. *Id.*, ¶¶ 48–49. The State in *Pickens* argued that "by the time police illegally searched the safe, they had enough information to obtain a search warrant for the safe," therefore "it follows that the police would have inevitably acquired a warrant and legally obtained the contents of the safe." *Id.*, ¶ 49. The *Pickens* court concluded that because there was "nothing in the record to support the view that the police were actively pursuing an alternative legal means," the State's inevitable discovery argument failed. *Id.*, ¶ 50. However, the facts presented in *Pickens* are readily distinguished from those in this case. The police in *Pickens* were not operating under an existing warrant, nor had they obtained any warrant at all pertaining to the defendant or the premises searched. *Id.*, ¶¶ 4–7.'

¶ 34. Here, on November 8, the search was believed to be ongoing under a valid search warrant issued

375

on November 5. During the course of that search, the evidence against Avery was mounting and all leads were pointing toward his involvement. This accumulating evidence had been documented over the course of the search, had been used in obtaining other warrants, and was then used in the supporting affidavit for the November 9 warrant application. The State concedes that the record is unclear as to whether the State was preparing the supporting affidavit at the time of the November 8 search. However, Fassbender confirmed that during the course of executing the initial November 5 warrant, he became cognizant that the search was extending over several days and, in recognition of that, the police "obtained another search warrant for the whole scene."

¶ 35. We are satisfied under the circumstances that the evidence in the record is sufficient to demonstrate that the police were actively pursuing a warrant for the continued search of Avery's trailer at the time of the November 8 search. *See id.,* ¶¶ 49–50. They anticipated the need for a warrant extension, accumulated evidence in support of that application, documented the factual basis and, one day after the November 8 search at issue, submitted the documented evidence in a supporting affidavit. Thus, even applying the court's reasoning in *Pickens,* the third requirement is met.

¶ 36. We conclude that the trial court did not err in admitting evidence resulting from the November 8 search of Avery's trailer, nor did it err in denying his postconviction motion challenging that decision. The record reflects that at the time of the November 8 search, sufficient leads existed to support extensive searches of Avery's trailer and that, even absent the fruit of the November 8 search, the November 9 warrant certainly would have been issued based on the

other evidence accumulated by the time of the warrant application. *See State v. Weber*, 163 Wis. 2d 116, 140–42, 471 N.W.2d 187 (1991). We therefore turn to whether the trial court erred in excluding evidence of third-party liability.

## II. The Trial Court Properly Excluded Evidence of Third-Party Liability.

### A. Background

¶ 37. Prior to trial, the State moved to prohibit Avery from presenting evidence of third-party liability. The court issued an order on July 10, 2006, that if Avery intended to suggest that a third party, other than Brendan Dassey,[8] was responsible for the crimes charged, the defense would need to notify the court at least thirty days prior to trial. The defense did so on January 10, 2007. Avery stated: "Several members of Avery's extended family as well as customers were on the Avery Salvage Yard property during the approximate time that Teresa Halbach likely was there. In that general sense, Avery can establish their opportunity —to about the same extent that the [S]tate can establish Steven Avery's opportunity." The State opposed his request, arguing that "the introduction of any third-party liability evidence regarding the possibility or probability that any of the individuals mentioned in their . . . filing committed the crimes charged" is precluded by *State v. Denny*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984).

¶ 38. In *Denny*, this court adopted the "legitimate tendency" test for third-party liability evidence. *Id.* at

---

[8] While the court permitted Avery to offer evidence that Brendan Dassey was responsible for the charged crimes, Avery did not offer any such evidence.

623 (citing *Alexander v. United States*, 138 U.S. 353 (1891)). Thus a defendant is required to demonstrate a legitimate tendency test that a third person could have committed the crime. The *Denny* court explained:

> [T]o show "legitimate tendency," a defendant should not be required to establish the guilt of third persons with that degree of certainty requisite to sustain a conviction in order for this type of evidence to be admitted. On the other hand, evidence that simply affords a possible ground of suspicion against another person should not be admissible. Otherwise, a defendant could conceivably produce evidence tending to show that hundreds of other persons had some motive or *animus* against the deceased—degenerating the proceedings into a trial of collateral issues. The "legitimate tendency" test asks whether the proffered evidence is so remote in time, place or circumstance that a direct connection cannot be made between the third person and the crime.
>
> Thus, as long as motive and opportunity have been shown and as long as there is also some evidence to directly connect a third person to the crime charged which is not remote in time, place or circumstances, the evidence should be admissible.

*Denny*, 120 Wis. 2d at 623–24 (citation omitted). The legitimate tendency test, characterized as a "bright line standard," was summarized by the supreme court as follows:

> Third-party defense evidence may be admissible under the legitimate tendency test if the defendant can show that the third party had (1) the motive and (2) the opportunity to commit the charged crime, and (3) can provide some evidence to directly connect the third person to the crime charged which is not remote in time, place or circumstance.

*State v. Scheidell*, 227 Wis. 2d 285, 296, 595 N.W.2d 661 (1999) (citing *Denny*, 120 Wis. 2d at 623–24).

378

¶ 39. Following a hearing on January 19, 2007, the trial court issued a written decision and order in which it applied the legitimate tendency test set forth in *Denny*. The court determined that none of the third-party liability evidence offered by Avery was admissible "because the defendant does not contend any of the other persons present at the Avery property on October 31, 2005, had a motive to murder Teresa Halbach or commit the other crimes alleged to have been committed against her." The trial court noted that Avery's *Denny* proffer, identifying "each customer or family friend and each member of his extended family present on the Avery salvage yard property," appeared to be an example of the dangers warned of by the court in *Denny*.[9] There, the court observed that "a defendant could conceivably produce evidence tending to show that hundreds of other persons had some motive or *animus* against the deceased —degenerating the proceedings into a trial of collateral issues." *Denny*, 120 Wis. 2d at 623–24.

### B. The Trial Court Properly Applied Denny.

¶ 40. Avery argues on appeal that the trial court erred when it applied *Denny* to the proffered third-

[9] The trial court's decision addresses Avery's proposed evidence as to each named third party, which included: Scott Tadych (Barb Janda's boyfriend), Andres Martinez (a salvage yard customer who denied being present on October 31, 2005), Charles Avery (Steven's brother), Earl Avery (Steven's brother), Robert Fabian (a friend of Earl's), and Blaine, Bobby and Bryan Dassey (Steven's nephews, Brendan Dassey's siblings).

While Avery's trial counsel testified at the postconviction hearing that the defense "would have settled on one or more people as to whom we thought we had the best case, that they had committed the crime," the trial court was assessing the offer of proof before it.

party liability evidence. Avery contends that (1) his "constitutional right to present a defense trumps the evidentiary rule articulated in *Denny*" and (2) *Denny* applies only when the defendant "seeks to introduce evidence of other possible perpetrators' motives to commit the crime," where the defendant has no such motive.[10] Avery further contends that if *Denny* does apply to the evidence proffered, then the trial court erred in its determination that the evidence failed to meet the requirements of *Denny*.[11]

¶ 41. Generally, the admissibility of evidence is determined by the trial judge subject to the limits of

---

[10] Avery additionally argues that the State opened the door to the introduction of third-party liability evidence by introducing forensic evidence that other persons had been excluded as perpetrators. Avery's argument is premised on the State's introduction of evidence that the DNA profiles of Barb Janda, Bobby, Brendan and Bobby Dassey, and Earl, Charles, Delores and Allen Avery did not match the DNA on the key to Halbach's vehicle or the blood in Halbach's car, but did match Steven Avery. Avery complains that he was precluded from soliciting testimony as to whether a fingerprint that did not match Avery was compared to that of Scott Tadych. However, Avery fails to cite to any authority in support of his argument and fails to adequately develop it. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (We need not consider arguments which are undeveloped or unsupported by references to relevant legal authority.).

[11] Avery additionally challenges the validity of the court's decision in *State v. Denny*, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984). Avery contends that *Denny* was wrongly decided; however, he acknowledges that, pursuant to *Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997), we lack the authority to overrule it. He raises the issue "to preserve it for review by the supreme court." *Denny* remains good law and we are not persuaded by Avery's contention that the *Denny* court erred in its adoption of the legitimate tendency test.

relevancy and adequacy of proof, and we afford the trial court broad discretion as long as the evidence tends to prove a material fact. *Michael R.B. v. State*, 175 Wis. 2d 713, 723–24, 499 N.W.2d 641 (1993) (citing Wıs. Stat. §§ 901.04, 904.01, 904.02; *Denny*, 120 Wis. 2d at 623) (additional citations omitted). However, "when the focus of a circuit court's ruling is on a defendant's asserted due process right to introduce evidence, the issue is more properly characterized as one of constitutional fact, and is, therefore, subject to de novo review."[12] *State v. Knapp*, 2003 WI 121, ¶ 173, 265 Wis. 2d 278, 666 N.W.2d 881, *vacated and remanded*, 542 U.S. 952 (2004), *reinstated in material part*, 2005 WI 127, ¶ 2 n.3, 285 Wis. 2d 86, 700 N.W.2d 899.

¶ 42. For purposes of our review, we bear in mind that "[m]aterial facts are those that are of consequence to the merits of the litigation. Relevancy, in turn, is a function of whether the evidence tends 'to make the existence of [a material fact] more probable or less probable than it would be without the evidence.' " *Michael R.B.*, 175 Wis. 2d at 724 (quoting *Denny*, 120 Wis. 2d at 623). "The proffered evidence need not prove a fact in a 'substantial way,' but it must do more than 'simply afford[ ] a possible ground of suspicion against another person.' " *Id.* (citing *Denny*, 120 Wis. 2d at 623).

¶ 43. First, as to Avery's contention that his constitutional right to present a defense "trumps the evidentiary rule articulated in *Denny*," the *Denny* court held that "even though the right to present witnesses . . . is a fundamental constitutional right, that evidence must be relevant to the issues being tried."

---

[12] Here, the trial court's ruling was not focused on Avery's right to present evidence, but Avery premises his appellate argument on this constitutional right and the State acknowledges this standard of review.

*Denny*, 120 Wis. 2d at 622. Second, like the trial court, we reject Avery's contention that *Denny* does not apply to third-party liability evidence when motive is not an issue. The trial court explicitly rejected Avery's assertion that Halbach's murder was a motiveless crime. Further, Avery does not provide any authority for his assertion that a defendant who demonstrates opportunity and direct connection is excused from demonstrating motive.

¶ 44. The defendant in *Denny* was convicted of first-degree murder. *Id.* at 617. At trial, the defendant claimed that he did not have a motive to murder the victim, but that "any one of a number of third parties" did have motive and opportunity. *Id.* The trial court barred the admission of the evidence, ruling it irrelevant. *Id.* at 621. Adopting and applying the "legitimate tendency" test on appeal, the *Denny* court concluded that the defendant's offer of proof was deficient. *Id.* at 625. While the defendant identified three possible third parties and two witnesses who could testify as to these parties' involvement with the victim, he was not able to satisfy all three requirements—motive, opportunity and direct connection—as to any one of them. *Id.*

■■

¶ 45. Here, Avery identified "each customer or family friend and each member of his extended family present on the Avery salvage yard" during the hours in question as "possible third-party perpetrators of one or more of the charged crimes." Avery acknowledges on appeal that he did not seek to prove that "any of the possible alternative perpetrators had an identifiable motive to kill Teresa Halbach." However, without evidence of motive, Avery's proffered third-party liability evidence fails the legitimate tendency test in *Denny*. The parties identified by Avery may have had the

opportunity to commit the crime; however, Avery was unable to demonstrate that any of the named individuals had a motive to commit the alleged offenses against Halbach.

¶ 46. In upholding the trial court's application of *Denny*, we reject Avery's reliance on *State v. Richardson*, 210 Wis. 2d 694, 563 N.W.2d 899 (1997), and *Scheidell*, 227 Wis. 2d 285. In *Richardson*, the court refused to adopt the legitimate tendency test for determining the admissibility of frame-up defense evidence. *Richardson*, 210 Wis. 2d at 697–99. The court acknowledged the legitimate tendency test for determining the introduction of third-party evidence, but saw no reason to adopt it where the defense alleges that "the victim was lying in an effort to frame him, not that someone else had committed the crime."[13] *Id.* at 704–05. Avery argues that, like the defendant in *Richardson*, he was seeking "to make a frame-up defense"—"the frame-up motive was police animosity towards the defendant." The introduction of third-party liability evidence and frame-up evidence are two separate issues, and Avery was permitted to introduce evidence that he had been

[13] Avery contends that *Richardson* is instructive in that the supreme court notes, "We do not consider whether the 'legitimate tendency' test is an appropriate standard for the introduction of third-party defense evidence." *State v. Richardson*, 210 Wis. 2d 694, 705 n.6, 563 N.W.2d 899 (1997). However, as the State points out, the supreme court later applied the "legitimate tendency" test to third-party defense evidence in *State v. Knapp*, 2003 WI 121, ¶ 173, 265 Wis. 2d 278, 666 N.W.2d 881, *vacated and remanded*, 542 U.S. 952 (2004), *reinstated in material part*, 2005 WI 127, ¶ 2 n.3, 285 Wis. 2d 86, 700 N.W.2d 899. *Denny* was also recognized by the United States Supreme Court in *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006), as an example of the "widely accepted" state rules regulating the admission of third-party liability evidence.

framed by the police. Avery fails to provide any facts, much less make any argument, linking his proffered third-party liability evidence to the alleged frame-up. Further, his argument fails to remedy the absence of a motive to harm Halbach on the part of the named third parties.

¶ 47. *Scheidell* is likewise inapposite. There, the court held that the legitimate tendency test "is not applicable to the introduction of allegedly similar crime evidence that is committed by an unknown third party. *Denny* simply does not apply to this type of other acts evidence." *Scheidell*, 227 Wis. 2d at 297. The court noted that "[i]n a situation where the perpetrator of the allegedly similar crime is unknown, it would be virtually impossible for the defendant to satisfy the motive or the opportunity prongs of the legitimate tendency test of *Denny*." *Scheidell*, 227 Wis. 2d at 296. Here, Avery's proffered defense evidence did not involve *unknown* parties committing allegedly similar crimes. Rather, it involved the introduction of *known* third-party liability evidence of the precise type contemplated by *Denny*. We conclude that the trial court properly applied the legitimate tendency test under *Denny*. We further conclude that Avery's proffered evidence failed to satisfy the first prong of the test.

¶ 48. We note that in its decision on the postconviction motion, the trial court addressed Avery's proffered evidence assuming that *Denny* does not apply. In conducting its alternative analysis, the trial court examined whether Avery's proffered third-party liability evidence satisfied the relevancy or probative value requirements of WIS. STAT. §§ 904.02 and 904.03. As the trial court observed in its written decision, the proffered evidence consisted largely of evidence relating to

the activities of the alleged third-party perpetrators on the day of the crime. The court noted:

> Avery offered no physical or other evidence connecting any of the individuals to the crime, other than their presence in the general vicinity. One can only imagine how much longer this six-week trial would have lasted had the court granted [Avery's] request to introduce third-party liability evidence implicating the ten individuals named in [Avery's] Statement on Third-Party Responsibility.

¶ 49. Even considering the more focused and more detailed evidence presented in Avery's postconviction motion, the trial court still found it lacking.[14] For example, Avery represents in his postconviction motion that he would have introduced evidence regarding Scott Tadych's reaction to the news of Avery's arrest and Tadych's attempt to sell a .22 caliber rifle belonging to one of the Dassey boys; Earl Avery's purported presence at the salvage yard after 3:30 or 4:30 p.m. on October 31, and his reaction to being interviewed by the sheriff's department; Charles Avery's jealousy of Steven Avery over money, Steven's potential share of the family business and Steven's girlfriend; and Bobby Dassey's statement that he had seen Halbach on the property

[14] We note that Avery's postconviction motion narrowed the proposed third-party perpetrators to four and then provided a more detailed statement of the proposed evidence as to each. While the court considered the additional evidence, its decision was clear that "the additional arguments and offers of proof Avery . . . . raises in his postconviction motion were waived by not being presented to the court in a timely manner." We agree. *See State v. Bustamante*, 201 Wis. 2d 562, 573, 549 N.W.2d 746 (Ct. App. 1996) (a review of the trial court's discretionary decision is based on the evidence available at the motion in limine).

before leaving to go hunting and his allegedly conflicting statements as to when he showered on October 31.

¶ 50. In reviewing Avery's postconviction motion, the trial court noted that the proffered evidence might have been relevant as to opportunity, or more specifically proximity, but not probative given the lack of any direct or indirect motive to harm Halbach to support it. We agree. While Avery can point to various alleged facts regarding the proposed third-party perpetrators, none of the evidence is remarkable absent any meaningful evidence of a motive or a physical connection to the crime. The trial court's relevancy analysis underscores the appropriateness of *Denny*'s legitimate tendency test as a mechanism of balancing the accused's right to present a defense against the State's interest in excluding evidence that, in the words of the trial court, is "no more than marginally relevant, of extremely limited probative value, and likely to confuse the jury and waste the jury's time."[15]

## III. Avery Consented to the Substitution of a Deliberating Juror.

### A. *Background*

¶ 51. Avery contends that his fundamental constitutional rights were violated when the court removed a deliberating juror without cause and substituted an

[15] The State argues that regardless of whether *Denny* applies, Avery failed to demonstrate that he was prejudiced by the court's ruling on the third-party liability evidence. In light of our conclusion on this issue, we need not address the State's argument. *See Walgreen Co.*, 311 Wis. 2d 158, ¶ 2 (noting that when resolution of one issue is dispositive, we need not reach other issues raised by the parties).

386

alternate juror. The trial court's findings of fact pertaining to Avery's challenge were set forth in its decision and order on Avery's postconviction motions. Avery's trial lasted nearly five weeks; it commenced on February 12, 2007, and was submitted to the jury on March 15, 2007, at 12:54 p.m. The jury was ordered to be sequestered in Chilton during deliberations and a thirteenth alternate juror was also sequestered without objection from the parties. Juror M. was one of the twelve jurors who initially began deliberating the case. However, in the evening after the first day of jury deliberations lasting approximately four hours, Juror M. made a request to a sheriff's deputy that he be excused from deliberations. The deputy relayed the request to Calumet County Sheriff Gerald Pagel, who telephoned the judge at his home in Manitowoc to inform him of the request. The trial court prepared a sealed memorandum on March 16, 2007, memorializing its conversation with Pagel. The summary of the conversation is as follows:

On Thursday, March 15, 2007 sometime around 9:00 p.m. the court received a telephone call from Sheriff Pagel indicating one of the jurors had presented a request to a deputy that he be excused from further jury service because of an unforeseen family emergency. Specifically, [Juror M.] was distraught and felt he could no longer serve as a juror. He reported his stepdaughter was involved in a traffic accident earlier in the evening which resulted in the totaling of her vehicle. I received no information about any injuries. His wife was very upset about the accident and of the amount of time [Juror M.] had been away from the family because of the trial. He reiterated that his family and especially his wife were very embarrassed by news reports at the time of original voir dire that he was living off the proceeds of her trust fund. There was also a suggestion that the juror and his wife had been having some form of marital

difficulties before the trial and the juror felt it was vital for his marriage that he be excused.

Upon receiving the phone call, the trial court contacted special prosecutor Kenneth Kratz and defense counsel Dean Strang and Jerome Buting by conference call. As these events transpired, the trial judge was at his home in Manitowoc, the defendant was being held in the Calumet county jail in Chilton, Kratz was presumed to be at his residence, and defense counsel were at a restaurant in Appleton. Counsel agreed that the court should speak personally with Juror M. and, if the information provided by Pagel was verified, the juror should be excused.

¶ 52. The court's memo reflects its conversation with Juror M.:

Following the conference call, I called Sheriff Pagel back. He was at the hotel, I believe originally in the parking lot. I told him I'd like to speak to [Juror M.] My recollection is that the sheriff called me back shortly thereafter and apparently handed the phone to [Juror M.] I could immediately sense that [Juror M.] was distraught. He sounded depressed. He spoke quietly and slowly. He confirmed the information I'd been told. He indicated he and his wife had had some marital problems before the trial and the trial was putting an extra strain on the relationship. He again mentioned, as he had during individual voir dire of the jurors on Monday, that his wife was upset about the trust fund reports involving a musician juror on the news. Things apparently boiled over when his stepdaughter was involved in a vehicle accident this evening and he was not there to provide support. My reading, without pressing him with questions too specific, was that he felt the future of his marriage was at stake if he was not excused. At that point I told him I'd heard all I needed to know. I thanked him for his service. I indicated that

I would not specify the nature of his request to be excused on the record. He thanked me for that. Sheriff Pagel indicated he would have [Juror M.] transported to his vehicle at Reisterer and Schnell.

Before the jury began its second day of deliberations on March 16, 2007, the court met with counsel in chambers to discuss how to proceed. Both defense counsel and the trial court agreed that the procedure would be governed by *State v. Lehman*, 108 Wis. 2d 291, 321 N.W.2d 212 (1982). Counsel for both parties agreed that under *Lehman*, the discharge of a juror during deliberations left the parties with three options: (1) stipulate to proceed with fewer than twelve jurors, (2) stipulate to the substitution of an alternate juror, or (3) have the court declare a mistrial. *See id.* at 313.

¶ 53. After the meeting, defense counsel met with Avery for approximately twenty minutes and recommended that Avery elect to replace Juror M. with the alternate juror. Both parties then agreed to this option,[16] with Avery specifically agreeing to it in an on-the-record colloquy with the court. The alternate juror replaced Juror M. and the jury was instructed to begin its deliberations anew.[17]

---

[16] Defense counsel proposed the following stipulation, to which the prosecution agreed:

> One, if the Court gives a proper instruction that jury deliberations must begin entirely anew[,] [a]nd, two, if each of the 11 presently deliberating jurors provides satisfactory assurance that they can and will follow an instruction to begin deliberations anew, then, three, the defense will agree that the person who has been the alternate to date should join the ranks of the 11, becoming the 12th regular juror and the deliberations may begin anew with this newly composed group of 12.

[17] The trial court instructed the jury as follows:

> Members of the jury,

After three additional days of deliberations, the jury returned its verdicts.

¶ 54. Avery challenged the substitution of the juror in his postconviction motion. Juror M. testified at the postconviction hearing and, in the trial court's estimation, "presented a somewhat different version of the facts." Juror M. denied both the existence of marital

---

One of your members has been excused from jury deliberations in this case because of an unforeseen family emergency. Although excusing a juror during deliberations rarely occurs, it is sometimes necessary.

The court has brought back the last alternate juror to participate in the deliberations in this case. Before those deliberations begin, I have an important further instruction for all of you.

The law requires that during deliberations, 12 people must have the opportunity to review the evidence in light of each juror's perception, memory and reaction. It is important that the jury reach its consensus through deliberations which are the common experience of all 12 jurors. Each of the 12 must have the opportunity to persuade the other members of the jury and to be persuaded by them. If you have formed any views about the evidence up until now, you must set those aside and start over.

To assure that these requirements are followed in this case, you are instructed that you must commence your deliberations anew. That means you should begin by electing a foreperson and then proceed to evaluate all the evidence as though you are just beginning to deliberate. This is necessary to assure the full participation of all the jurors in the deliberation process.

Before I excuse you to begin deliberating, I must be assured each of you will be able to deliberate on this basis. Therefore, the court will individually ask one more question.

You must accept this juror as an equal member of this jury, giving her the full respect and authority you would give to any other juror.

Will you follow this instruction I have just given you and begin your deliberations anew?

The trial court then addressed each juror individually and confirmed that he or she would adhere to the instruction.

problems and that he had informed the deputy sheriff that his stepdaughter's car was totaled in an accident. However, the trial court found Juror M.'s testimony at the postconviction hearing, held two and one-half years after the events transpired, "not credible." The trial court rejected Avery's challenge to Juror M.'s dismissal, determining that it was appropriate under the circumstances for the court to conduct an off-the-record voir dire of Juror M. without Avery or the attorneys present and that the record established cause for Juror M.'s dismissal.

### B. *The Trial Court's Procedure Properly Adhered to Lehman.*

¶ 55. Avery contends that the court failed to follow the procedures set forth in *Lehman* when it excused Juror M. The *Lehman* court concluded that in order to ensure a fair trial, the circuit court must have discretion to discharge a regular juror for cause during jury deliberations. *Id.* at 300. The *Lehman* court provided the following guidance for circuit courts:

> When a juror seeks to be excused, or a party seeks to have a juror discharged, whether before or after jury deliberations have begun, it is the circuit court's duty, prior to the exercise of its discretion to excuse the juror, to make careful inquiry into the substance of the request and to exert reasonable efforts to avoid discharging the juror. Such inquiry generally should be made out of the presence of the jurors and in the presence of all counsel and the defendant. The juror potentially subject to the discharge should not be present during counsel's arguments on the discharge. The circuit court's efforts depend on the circumstances of the case. The court must approach the issue with extreme caution to avoid a mistrial by either needlessly

391

> discharging the juror or by prejudicing in some manner the juror potentially subject to discharge or the remaining jurors.

*Id.* (footnote omitted). Avery contends that the trial court failed to follow the procedure set forth in *Lehman* by (1) engaging in ex parte communications with the excused juror, (2) failing to question the excused juror on the record, and (3) failing to make a sufficient inquiry to establish cause for discharging the juror. Avery contends that these combined errors resulted in the trial court's discharge of the deliberating juror without cause.

### 1. The Trial Court's Ex Parte Communication with the Excused Juror Was Harmless Error.

¶ 56. Avery first contends that he had an unwaivable right to be present with counsel when the trial court communicated with the deliberating juror. The State concedes that, as a general rule, a defendant has the right to be present personally and by counsel during voir dire and that the defendant must personally waive that right. *See State v. Anderson*, 2006 WI 77, ¶ 71, 291 Wis. 2d 673, 717 N.W.2d 74; *State v. Tulley*, 2001 WI App 236, ¶ 6, 248 Wis. 2d 505, 635 N.W.2d 807. While the trial court acknowledged the general rule, it noted that no reported cases address the issue in the context of the facts presented here "when a juror reports an emergency during late evening hours while court is not in session and the parties and counsel are not readily available." It observed that in *United States v. Gagnon*, 470 U.S. 522, 526 (1985), the Supreme Court held that the defense "has no constitutional right to be present at every interaction between a judge and a juror." However, the trial court went on to determine that even if its

392

contact with Juror M. violated Avery's constitutional right to be present, the error was harmless. We likewise assume error and agree with the trial court's assessment.

¶ 57. In *Tulley*, this court held that a violation of a defendant's right to be present is subject to a harmless error review. *Tulley*, 248 Wis. 2d 505, ¶ 7. Generally an error is harmless if there is no reasonable possibility that it contributed to the conviction. *Id.* "A 'reasonable possibility' is one sufficient to undermine confidence in the outcome of the proceeding." *Id.* The burden of proof is on the beneficiary of the error to establish that the error was not prejudicial. *Id.* In satisfying its burden, the State cites to *United States v. Doherty*, 867 F.2d 47, 72 (1st Cir. 1989), for the proposition that a court's ex parte communication with an excused juror is harmless error because the ex parte conversation cannot influence the dismissed juror's further deliberations where there are none, nor can it influence the remaining eleven jurors when they have no further contact.

¶ 58. We agree that the logic of *Doherty* applies here. The court's discussion with Juror M. could not have influenced Juror M.'s further deliberations, nor could it have influenced the remaining eleven jurors because Juror M. had no further contact with them. Moreover, Avery was present during the voir dire of all of the jurors who convicted him, including the substitute juror. He received a fair trial and was convicted by twelve jurors after they had been instructed and agreed to begin new deliberations. *See State v. Deer*, 125 Wis. 2d 357, 364, 372 N.W.2d 176 (Ct. App. 1985) (we presume that juries follow the instruction given). Moreover, the alternate juror had not yet been discharged and therefore had no opportunity to be improperly

393

influenced prior to entering deliberations. As in *Doherty*, we conclude that the trial court's ex parte discussion with the excused juror was harmless error.

> **2. The Trial Court Properly Exercised its Discretion in Discharging a Deliberating Juror for Cause.**

¶ 59. Avery further challenges the trial court's discharge of the deliberating juror as being without cause. He focuses his challenges on the trial court's procedure under *Lehman*. The State argues waiver. While the challenges are arguably waived because Avery and his counsel consented to the court's procedure, we nevertheless address these challenges on the merits. *See State v. Leitner*, 2001 WI App 172, ¶ 42, 247 Wis. 2d 195, 633 N.W.2d 207 (the waiver rule is one of judicial administration, and appellate courts have the authority to ignore a waiver when a case presents an important recurring issue).

> **a. The trial court's memorialization of the conversation was reasonable under the circumstances.**

¶ 60. With respect to the failure to question the juror on the record, the trial court noted *Lehman*'s statement that "[t]he circuit court's efforts depend on the circumstances of the case." *Lehman*, 108 Wis. 2d at 300. Here, the trial court received the juror's request to be excused at approximately 9:00 p.m. The request was urgent and was premised on a motor vehicle accident involving the juror's stepdaughter and also concerns regarding marital difficulties. The court alerted all counsel to the situation before contacting the juror. It

was agreed by all parties that the trial court would contact the juror and, if the court verified the juror's concerns, the trial court would excuse the juror. Because of the late hour, the court did not have a contemporaneous record of its conversation with the juror; however, the court memorialized its conversation in a memorandum. We conclude that, given the circumstances, the trial court's approach was reasonable.

> b. *The trial court's inquiry into the substance of the request and efforts to avoid discharging the juror were reasonable under the circumstances.*

¶ 61. Next, Avery argues that the trial court failed in its duty "to make careful inquiry into the substance of the request and to make reasonable efforts to avoid discharging the juror." *See id.* Again, we are unpersuaded. The facts as documented by the trial court speak for themselves. The juror expressed an imminent concern regarding a car accident, but also an ongoing concern regarding marital issues. While the former concern necessitated that he be excused for the evening or longer, the latter concern indicated that he would not be in a position to return to deliberations.[18] While

---

[18] Avery raises Juror M.'s postconviction testimony in support of his argument. Juror M. testified that he did not recall conveying that his stepdaughter's accident was serious or that he was having marital problems. However, the trial court found Juror M.'s postconviction testimony not credible on these issues. *See Richards v. Mendivil*, 200 Wis. 2d 665, 671, 548 N.W.2d 85 (Ct. App. 1996) (we will not second-guess credibility determinations on appeal). Further, Juror M. also testified that he informed Pagel and the judge that "there was a family emergency and [he] had to go home" and, more specifically, that his stepdaughter had been in an automobile accident. Juror M.

*Lehman* requires the court to conduct a careful inquiry, we do not read *Lehman* as requiring the trial court to delve into Juror M.'s marital issues once it was satisfied that his behavior suggested that he could not continue to serve as a juror. As the trial court reasoned in its postconviction decision:

> The question is not so much fact-based as behavioral-based. That is, whatever the facts were behind [Juror M.'s] marital problems, his behavior suggested he was preoccupied by those problems and could not continue to serve as a juror . . . . The court concluded that [Juror M.'s] concern over his marriage seriously jeopardized his ability to devote himself to his duties as a juror. If his request was denied, there was a very real danger that he would overtly or subconsciously engage in a rush to judgment in order to get home to save his marriage. That's the conclusion that was reached by both the court and Avery's two able and experienced trial attorneys.

also acknowledged being "upset" and "distraught" during the conversations with Pagel and the judge.

The trial court's exercise of discretion is based on the facts before it at the time of its decision. While Avery contends that the trial court should have made further inquiries into the nature of the accident, for example ascertaining whether his stepdaughter required hospitalization, it is evident from the trial court's summarizing memorandum that the accident was represented as being serious and, thus, there was no reason to inquire further. Juror M. testified at the postconviction hearing that the impression he was trying to create during his phone call with the judge was that he "was upset"; he wanted the judge to conclude that he "should be let go" and allowed to return home. When asked whether his "conversation with [the judge] was designed to accomplish that objective," Juror M. responded, "Under the circumstances, yes." Juror M.'s acknowledged objective supports the trial court's concern regarding his ability to continue as a juror.

Based on our review of the record, we are satisfied that the trial court conducted the sort of careful inquiry and reasonable effort to avoid discharge contemplated by *Lehman*. We conclude that the trial court properly exercised its discretion when it excused Juror M.[19]

 c. *WISCONSIN STAT. § 972.10(7) Does Not Prohibit the Substitution of a Juror with the Parties' Consent.*

¶ 62. Avery further contends that even when cause exists and all counsel agree, a trial court's substitution of a deliberating juror violates WIS. STAT. § 972.10(7). Again, the State argues waiver. We nevertheless choose to address the issue on the merits. *See Leitner*, 247 Wis. 2d 195, ¶ 42.

¶ 63. WISCONSIN STAT. § 972.10(7) provides: "If additional jurors have been selected under [WIS. STAT. § ] 972.04(1) and the number remains more than required at final submission of the cause, the court shall determine by lot which jurors shall not participate in deliberations and discharge them." In addressing Avery's postconviction challenges, the trial court acknowledged that "[t]he unobjected to decision . . . to sequester one additional juror in addition to the 12 jurors who were deliberating was error." However, the

---

[19] Avery contends that "[t]he court's removal of Juror [M.] during deliberations without a record establishing cause, which flowed from the absence of an on-the-record voir dire in the presence of Avery and his attorneys, is structural error requiring reversal of Avery's convictions." Based on our determination that the record established cause for the trial court's excusal of Juror M. and that, under the circumstances presented, the trial court's contemporaneous memorandum of its discussion with Juror M. provided a sufficient record of its conversation, we reject this argument.

court disagreed that § 972.10(7) prohibits the parties from consenting to the substitution of one of the additional jurors in the event that a regular juror is excused. We likewise conclude that § 972.10(7) does not address the dispositive issue in this case, whether a court may substitute an alternate juror for a deliberating juror with the consent of the parties under the procedure set forth in *Lehman*. As the trial court noted, there is a distinction between discharging a juror under § 972.10(7) and calling a juror back as a substitute at some point in the future with the parties' consent.

¶ 64. In *Lehman*, a deliberating juror was discharged due to illness. *Lehman*, 108 Wis. 2d at 295. The defense counsel and defendant objected to the substitution of an alternate juror and would not stipulate to a jury of eleven persons. *Id.* The alternate juror, who had been discharged prior to the submission of the case to the jury, was substituted and joined the deliberating jurors without first being questioned by the court or counsel and without an instruction being given to the deliberating jurors. *Id.* at 294. The alternate juror in *Lehman* had returned to his home after being discharged, but "spoke to no one about the case after he was released from jury duty and before he entered the jury room." *Id.*

¶ 65. In addressing the defendant's challenges to the verdict, the court addressed Wis. Stat. § 972.05 (1979–80),[20] the predecessor statute to Wis. Stat. § 972.10(7). The *Lehman* court reasoned:

> Whether or not [§] 972.05 requires the circuit court to discharge an alternate juror on final submission of

---

[20] Wisconsin Stat. § 972.05 (1979–80) provided in relevant part, "If before the final submission of the cause a regular juror dies or is discharged, the court shall order an alternate juror to take his place in the jury box."

the cause, the alternate juror in the instant case was discharged by the circuit judge. The ultimate question is not whether the alternate juror is to be discharged upon final submission but whether [§] 972.05 allows a circuit court judge, during jury deliberations, to order an alternate juror, whether or not previously discharged, to take the place of a regular juror who is discharged after jury deliberations have begun.

*Lehman*, 108 Wis. 2d at 305. The State in *Lehman* argued that the statute governed only substitution before final submission and that by failing to address the substitution of jurors during deliberations, the legislature intended to permit the circuit court to exercise its discretion on that issue. *Id.* The supreme court rejected the State's argument, instead declining "to infer from a silent statute that the legislature approves substitution during jury deliberations." *Id.* at 305–06. The *Lehman* court held:

[I]n the absence of express authorization by statute or rule for substitution of an alternate juror for a regular juror after jury deliberations have begun *or in the absence of consent by the defendant to such substitution,* hereafter it is reversible error for a circuit court to substitute an alternate juror for a regular juror after jury deliberations have begun.

*Id.* at 313 (emphasis added; footnote omitted). Here, there is still no express authorization by statute or rule for the substitution of an alternate juror for a regular juror after jury deliberations have begun, and the State does not argue otherwise. However, there is Avery's consent to the substitution, and that consent satisfies the procedural requirements of *Lehman*.

¶ 66. This conclusion is in keeping with that of the Seventh Circuit in *United States v. Josefik*, 753 F.2d 585 (7th Cir. 1985), a case cited by the trial court in its

399

postconviction order. In *Josefik*, the court observed that the federal rules did not provide for recalling an alternate juror after he or she is discharged and that policy, as well as the language of the rule, forbids the practice. *Id.* at 587. Nevertheless, the court held that the defendant waived any challenge based on a violation of the rule by consenting to the alternate's recall. *Id.* at 588. The court reasoned that "[i]f the defendant would prefer to take his [or her] chances with the jury in its reconstituted form rather than undergo the expense and uncertainty of a new trial, why should he [or she] not be allowed to?" *Id.* While acknowledging that there are limits to waiver, the *Josefik* court observed that there is nothing in the procedure used in that case that shocked the conscience. *Id.* Nor is there anything in this case that does so. Despite the substitution of an alternate juror during deliberations, Avery was afforded a jury of twelve culled from a jury pool narrowed by voir dire in which he participated. Due to error, the alternate juror had not yet been discharged and therefore had no opportunity to be improperly influenced prior to entering deliberations. The jury was instructed, and each juror agreed, to commence deliberations anew. The newly empaneled jury deliberated for three days before returning a verdict. And Avery consented to this process in an on-the-record colloquy.

■■

¶ 67. For the reasons stated above, having obtained Avery's consent both through his counsel and personally in an on-the-record colloquy, the trial court did not err in permitting the substitution under *Lehman*.

### d. *Avery Did Not Receive Ineffective Assistance of Counsel.*

¶ 68. Finally, Avery argues that his defense counsel were ineffective for (1) agreeing that, if the facts presented by Pagel were verified, the juror would be excused and (2) entering into a stipulation allowing the court to substitute an alternate juror after Juror M. was removed, a procedure not permitted by statute.[21] Avery contends that each of these decisions was made without full knowledge of the facts or without a correct understanding of the governing law. We have reviewed the record; we reject Avery's arguments.

¶ 69. To succeed on a claim of ineffective assistance of counsel, a defendant must prove both deficient performance and prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Sanchez*, 201 Wis. 2d 219, 236, 548 N.W.2d 69 (1996) (the *Strickland* analysis applies equally to ineffectiveness claims under the state constitution). To prove deficient performance, a defendant must show specific acts or omissions of counsel, which are "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. To prove prejudice, a defendant must show that counsel's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome. *See id.* at 687. On appeal, the trial court's findings of fact will be upheld unless they are clearly erroneous. *See State v. Pitsch*, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985).

---

[21] Avery additionally argues that counsel were ineffective for permitting the trial court to converse with Juror M. outside of their presence; however, we have addressed this issue and deemed it harmless error.

However, proof of either the deficiency or the prejudice prong is a question of law that this court reviews independently. *See id.*

¶ 70. Avery contends that counsel's consent to the court's removal of a deliberating juror was "factually ill-informed." Avery argues that his counsel had incomplete facts regarding the nature of the stepdaughter's automobile accident, and he speculates that further discussion would have resulted in his attorneys discovering "the truth" about Juror M.'s request. We are unpersuaded. As discussed earlier, the actual basis of Juror M.'s request to be excused is less important than what was conveyed to the trial court at the time of his request—he was upset, distraught and communicating a need to address a family emergency at home. That Juror M.'s later testimony (which was deemed not credible by the trial court) contradicted his representations on the night of his excusal does not reflect on the performance of Avery's defense counsel. Rather, defense counsel's concerns regarding Juror M.'s ability to focus on the case and fully participate in deliberations were valid under the circumstances.

¶ 71. One of Avery's defense counsel, Strang, testified at the postconviction hearing:

> I certainly did have a concern that if [Juror M.] was distracted by a family tragedy, or something that was weighing heavily on him, that he might be someone who would be inclined not to deliberate fully or with . . . an exclusive focus on the case. But that wasn't a concern I had before the phone call. I wasn't out to get rid of this juror.

Indeed, Strang was aware of his and Avery's right to be present during the court's questioning of the juror, but because of the seemingly urgent circumstances did not

raise the request. For whatever reason, it was Juror M.'s intention to create a sense of urgency surrounding his request to be allowed to go home; that sense of urgency was communicated to the judge and to counsel. We cannot now fault counsel for believing what was being communicated at the time of Juror M.'s request, and we decline Avery's invitation to speculate as to how Juror M.'s representation of his situation would have differed if he had been questioned in the presence of Avery and his defense counsel.

¶ 72. Avery additionally contends that his counsel's performance was deficient in advising that he forego a mistrial because it was based on a mistaken understanding of the law—that substituting the alternate was legally permissible—and that he was prejudiced as a result. For the reasons set forth above, counsel correctly understood the law under both WIS. STAT. 972.10(7) and *Lehman*. Insofar as counsel advised Avery to forego a mistrial, this is the sort of strategic advice one would expect a defendant to receive from counsel, and we will not second guess such advice on appeal if it is rationally based on the facts and law. *See State v. Elm*, 201 Wis. 2d 452, 464–65, 549 N.W.2d 471 (Ct. App. 1996). Strang testified that Avery was informed of his options under *Lehman*, including the right to have the court declare a mistrial. *See Lehman*, 108 Wis. 2d at 313. Defense counsel advised that Avery not move for mistrial because the case would go to trial again and, for financial reasons, neither defense counsel would be able to represent him. Counsel testified that, all things considered, their case had gone in as well as they could have hoped, and it was in Avery's best interest for that jury to continue to deliberate on the evidence presented. In light of the facts surrounding Avery's decision to forego a

mistrial, there is no indication that he was deprived of a fair trial or reliable outcome as a result. *See Strickland,* 466 U.S. at 687.

¶ 73. Finally, we reject Avery's contention that this court should presume prejudice because the removal of a deliberating juror without cause has repercussions which are necessarily unquantifiable and indeterminate. In support, Avery relies on *United States v. Curbelo,* 343 F.3d 273 (4th Cir. 2003), and *United States v. Essex,* 734 F.2d 832 (D.C. Cir. 1984). Avery's reliance is misplaced; both cases involved verdicts returned by eleven jurors without the defendant's consent. In *Curbelo,* the court held that "depriving a defendant of the verdict of twelve jurors, without his [or her] consent or any finding of good cause," is structural error requiring reversal. *Curbelo,* 343 F.3d at 281. *Essex* also involved a presumption of prejudice when the court permitted a jury of eleven to continue deliberations and return a verdict without a finding of good cause as to the twelfth juror's absence and without the stipulation of the defendant. *Essex,* 734 F.2d at 835, 839–40. Here, as discussed above, Avery received exactly what he was entitled to and consented to—a verdict returned by twelve jurors who were instructed to commence deliberations together and who are presumed to have done so.

¶ 74. For reasons discussed above, we also reject Avery's contention that defense counsel's performance was deficient for believing that substituting an alternate was legally permissible. Thus, we conclude that Avery has failed to demonstrate either that his trial counsel's performance was deficient or that he was prejudiced as a result of any alleged deficiency.[22]

---

[22] We also need not address Avery's contention that the trial court's dismissal of a deliberating juror was plain error or that

## CONCLUSION

¶ 75. We conclude that the trial court did not err in its evidentiary rulings denying Avery's motion to suppress evidence recovered during the November 8 search of his trailer and precluding Avery's introduction of third-party liability evidence under *Denny*. We further conclude that the trial court's dismissal of a deliberating juror for cause and with the consent of all parties does not constitute reversible error. We affirm the judgments and the order denying Avery's motion for postconviction relief.

*By the Court.*—Judgments and order affirmed.

he is entitled to a new trial in the interest of justice. For the reasons stated above, the court's dismissal of a deliberating juror for cause and with the consent of all parties was not error, plain or otherwise, and thus does not entitle him to a new trial.