STATE of Wisconsin, Plaintiff-Appellant,

v.

Mastella L. JACKSON, Defendant-Respondent.†

Court of Appeals

*No.2014AP2238–CR. Submitted on briefs April 14, 2015.
—Decided May 12, 2015.*

2015 WI App 49

(Also reported in 866 N.W.2d 768.)

† Petition for Review filed.

555

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Jeffrey J. Kassel*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Andrew R. Hinkel*, assistant state public defender, Madison.

Before Hoover, P.J., Stark and Hruz, JJ.

¶ 1. STARK, J. Mastella Jackson made inculpatory statements to police while in custody, both before

and after receiving *Miranda*[1] warnings. Some of her statements were included in an affidavit used to obtain a warrant to search her home. Then, while the search was underway, Jackson was brought to the home and told police where to find certain physical evidence. The circuit court subsequently granted Jackson's motion to suppress her statements to police, as well as the physical evidence obtained during the search of her home.

¶ 2. On appeal, it is undisputed that Jackson's statements were properly suppressed. However, the State argues the circuit court erred by suppressing the physical evidence because: (1) the untainted portions of the search warrant affidavit established probable cause to search Jackson's home; and (2) the physical evidence would have been inevitably discovered, even if Jackson had not told police where to find it. We agree with the State on both of these points. Accordingly, we reverse that portion of the circuit court's order granting Jackson's motion to suppress the physical evidence obtained during the search of her home.

## BACKGROUND

¶ 3. At about 1:25 p.m. on February 21, 2012, officers were dispatched to the Road Star Inn in Grand Chute, where they discovered the body of Jackson's husband, Derrick Whitlow, in Room 114. A subsequent autopsy revealed that Whitlow had been stabbed approximately twenty-five times.

¶ 4. Later that afternoon, police made contact with Jackson at her residence. She was taken to the police station, where she was placed in an interrogation room at about 4:30 p.m. Police began questioning

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

her at about 6:24 p.m. Jackson was not informed of her *Miranda* rights. She was told she was not under arrest and was free to leave.

¶ 5. At about 7:02 p.m., Jackson began complaining of stomach pain. At 7:22 p.m., a video recording of the interrogation shows Jackson doubled over in pain. At 7:24 p.m., Jackson again complained of stomach pain, and an officer offered to retrieve her prescription medication from her home. At about 7:25 p.m., while doubled over and complaining of stomach pain, Jackson asked to leave, stating, "Can I go home right now, please, I don't want to talk . . . . [C]an I go with you [to get the medication], can I just go home or do I have to stay[?]" One of the officers responded that he needed to make a phone call and then left the room. The other officer immediately continued the interrogation.

¶ 6. At about 8:36 p.m., Jackson began to make incriminating statements. At around 9:19 p.m., she admitted going to Whitlow's room at the Road Star Inn earlier that afternoon. She told police Whitlow attacked her when she arrived. She conceded she may have brought a knife with her to the hotel. At 9:37 p.m., Jackson was allowed to take prescribed oxycodone for her pain.[2]

¶ 7. After Jackson made these incriminating statements, police applied for a warrant to search her house and garage. The affidavit in support of the search warrant, which was signed by detective Michael Renkas, relied in part on Jackson's statements that Jackson went to see Whitlow at the Road Star Inn that afternoon, she may have brought a knife, and she and Whitlow "[got] into a confrontation[.]" The search war-

_____

[2] One of the officers who interrogated Jackson also testified at a suppression hearing that Jackson took liquid Percocet before she was transported to the police station.

rant was authorized at 11:32 p.m. on February 21.[3] Police began searching Jackson's residence at approximately 12:50 a.m. on February 22.

¶ 8. Meanwhile, officers at the police station continued interrogating Jackson. She was finally informed of and waived her *Miranda* rights at about 12:39 a.m. on February 22, approximately six hours after the interrogation began. Jackson subsequently admitted stabbing Whitlow. She also admitted putting the knife she used and the clothes she was wearing during the stabbing in a garbage can in her garage.

¶ 9. Jackson's interrogation at the police station ended at 2:01 a.m. on February 22. Detective Brad Kuehl then took Jackson to her residence, where the search was still in progress. Based on information Jackson provided while at the residence, Kuehl directed the searchers to a garbage can they had not yet examined. Inside the garbage can, police found a duffel bag containing a Winchester knife, bloody shoes, and bloody clothing.

¶ 10. The following day, Jackson was charged with one count of first-degree intentional homicide (domestic abuse) and one count of misdemeanor bail jumping. Jackson moved to suppress all of her statements to police, as well as any physical evidence

---

[3] Police also applied for and received a warrant on February 21 to search Jackson's person, clothing, and personal effects and to collect biological samples. Warrants were subsequently issued on February 24, March 2, and April 5, authorizing police to take photographs of Jackson's body using an alternative light source to identify bruising and other injuries. Another warrant, issued on March 7, authorized police to search Jackson's home a second time for a jacket with the words "NEW YORK" in white or light-colored letters.

derived from those statements. The circuit court conducted a series of hearings on Jackson's suppression motion. Several police officers testified about the interrogation of Jackson and the search of her home. The circuit court also reviewed the video recording and a transcript of the interrogation. A toxicologist and a psychologist called by Jackson testified about her state of mind during the interrogation, including the effects of medications she was taking.

¶ 11. In a June 16, 2014 oral ruling, the circuit court found that Jackson was in custody for *Miranda* purposes at 7:25 p.m. on February 21, 2012, and that police intentionally violated her rights by interrogating her after that point without providing *Miranda* warnings. The court therefore suppressed as a violation of *Miranda* all statements Jackson made to police between 7:25 p.m. and 12:39 a.m., when she was finally advised of her *Miranda* rights. Based on *Missouri v. Seibert*, 542 U.S. 600 (2004), the court also suppressed the statements Jackson made after she received *Miranda* warnings, including her statement telling police where to find the knife and bloody clothes. The court further found that Jackson's statements were involuntary.

¶ 12. In addition, the court suppressed the physical evidence obtained during the search of Jackson's residence on February 22, 2012. The court reasoned that, when Jackson's improperly obtained statements were excised from the search warrant affidavit, the remaining facts failed to establish probable cause for a warrant to search her home. The court also ruled that, even if there was probable cause for the search warrant, suppression of the physical evidence was necessary under the fruit of the poisonous tree doctrine because the evidence was discovered due to Jackson's

tainted statement telling police where to look.[4] The court rejected the State's argument that the physical evidence was admissible under the inevitable discovery doctrine.

¶ 13. A written order granting Jackson's motion to suppress her statements to police and the physical evidence obtained during the February 22 search was entered on September 8, 2014.[5] The State now appeals, arguing the circuit court erred by suppressing the physical evidence. *See* Wis. Stat. § 974.05(1)(d)2. (state may appeal an order suppressing evidence).[6]

¶ 14. Further facts pertinent to our decision are included in the discussion section.

## DISCUSSION

¶ 15. Our review of an order granting a motion to suppress presents a mixed question of fact and law. *State v. Casarez*, 2008 WI App 166, ¶ 9, 314 Wis. 2d 661, 762 N.W.2d 385. We uphold the circuit court's findings of historical fact unless they are clearly erro-

---

[4] The fruit of the poisonous tree doctrine is, broadly speaking, a " 'device to prohibit the use of any secondary evidence which is the product of or which owes its discovery to illegal government activity.' " *State v. Knapp*, 2005 WI 127, ¶ 24, 285 Wis. 2d 86, 700 N.W.2d 899 (quoted source omitted).

[5] The circuit court denied Jackson's requests to suppress statements made by Jackson's son, evidence found at the Road Star Inn, evidence obtained pursuant to the warrants authorizing searches of Jackson's person, surveillance video from Walmart showing Jackson buying a knife, and a jacket that was found during the second search of her home. Those rulings are not at issue in this appeal.

[6] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

neous, but the application of the law to those facts presents a question of law subject to independent appellate review. *Id.*

¶ 16. Here, the State argues the circuit court erred by suppressing the physical evidence obtained during the February 22 search of Jackson's home because: (1) the untainted portions of the search warrant affidavit established probable cause for the search; and (2) the physical evidence would have been inevitably discovered, even if Jackson had not told police where to look. We address these arguments in turn.

## I. Probable cause for the search

¶ 17. "A search warrant may issue only on probable cause." *State v. Romero*, 2009 WI 32, ¶ 16, 317 Wis. 2d 12, 765 N.W.2d 756. In deciding whether probable cause existed to issue a search warrant, we examine the totality of the circumstances presented to the warrant-issuing magistrate to determine whether he or she had a substantial basis for concluding that there was a fair probability that a search of the specified premises would uncover evidence of wrongdoing. *Id.*, ¶ 3. However, where, as here, the circuit court has concluded the affidavit in support of a search warrant contained both tainted and untainted evidence, we independently determine whether the untainted evidence, standing alone, was sufficient to support a finding of probable cause. *State v. St. Martin*, 2011 WI 44, ¶ 17, 334 Wis. 2d 290, 800 N.W.2d 858.

¶ 18. In this case, when Jackson's tainted statements to police are excised from the search warrant affidavit, the following untainted evidence remains:

- At 1:25 p.m. on February 21, 2012, officers were dispatched to the Road Star Inn in Grand Chute, where they found Whitlow's body in Room 114. Whitlow had suffered significant cut wounds to his neck, throat, upper chest, and right arm and hand.

- There was substantial blood and blood spatter on the wall, bed, and floor of the hotel room. Based on his training and experience, detective Renkas believed anyone who was in the room with Whitlow when he was stabbed would likely have a significant amount of blood on his or her clothing or shoes.

- An eight-inch Winchester brand knife sheath was found next to Whitlow's body, but no knife was recovered.

- Dave Hoehne, who was working at the front desk of the Road Star Inn on February 21, reported that Whitlow had been staying in Room 114 since February 17. Hoehne stated he knew Whitlow had been having problems with his wife.

- Angelica Felipe, another Road Star Inn employee, reported that she was doing the laundry in Room 111 from approximately 1:00 to 1:30 p.m. on February 21, when she saw a person wearing a gray hooded sweatshirt knock on the door of Room 114. The person's hood was pulled over his or her head. The person was admitted into the room by someone inside, and Felipe then heard a male voice screaming for help and heard what she thought was someone being hit. Felipe went to the manager to get help and briefly saw the person in the hooded sweatshirt leaving. Hotel staff then entered the room, found Whitlow, and called police.

- Eugene Brown, who was staying in Room 115 at the Road Star Inn, reported he was in his room when he heard a female voice yelling. He thought it was the cleaning employee, so he left his room to see what was happening. He then realized the yelling voice could not be the cleaning employee because he saw her in the hallway. When Brown was just past Room 114, he heard a male voice yelling, "[H]elp me, help me." Brown then went to get help.

- Eleven-year-old R.L.D.J. was interviewed by police on the day of the stabbing and told them Whitlow was his father and Jackson was his mother. R.L.D.J. reported that his family had been living together at their home until a few days earlier, when Whitlow left to stay at the Road Star Inn. Police were aware from previous contacts with Whitlow and Jackson that they resided at 2505 West Fourth Street in Appleton.

- R.L.D.J. reported Whitlow had left the family home because he and Jackson "had been having issues that included 'adult conversations' that became loud."

- R.L.D.J. told police he stayed home from school with Jackson on February 21, and in the early afternoon, Jackson became angry because Whitlow had destroyed some family pictures and keepsakes. Jackson then left the house and was gone for about fifteen to twenty minutes.

- When Jackson returned to the house, R.L.D.J. "heard a zipper sound and then heard [her] go directly into the bathroom" and take a shower. When Jackson got out of the shower, "she was in different clothing than . . . what she had been wearing earlier in the day."

- Jackson told R.L.D.J. not to tell anyone she had left the house that day.

566

¶ 19. We agree with the State that this evidence provided a substantial basis to conclude there was a fair probability a search of Jackson's residence would uncover evidence of wrongdoing. *See Romero,* 317 Wis. 2d 12, ¶ 3. First, the evidence in the affidavit suggested Jackson had a motive to harm Whitlow— both Hoehne and R.L.D.J. reported Whitlow had moved out of the family home several days earlier due to marital problems, and R.L.D.J. specifically told police Jackson became angry with Whitlow in the early afternoon on February 21 after learning he had destroyed family pictures and keepsakes. Second, R.L.D.J. told police Jackson left the house shortly after becoming angry with Whitlow and returned fifteen to twenty minutes later, which suggested Jackson had the opportunity to commit the crime. Third, R.L.D.J.'s statement that Jackson told him not to tell anyone she left the house that day is evidence of a guilty conscience. Fourth, while no one at the Road Star Inn identified Jackson as the perpetrator, Felipe saw a person enter Room 114 between 1:00 and 1:30 p.m., just before she heard a man shouting for help. Brown heard a female voice yelling and then heard a man shouting for help just before Whitlow was found. This suggests the person who killed Whitlow was a woman.

¶ 20. Finally, based on his training and experience, detective Renkas averred that any person who was in the room with Whitlow when he was stabbed would have had significant amounts of blood on his or her clothing and shoes. This evidence, in combination with R.L.D.J.'s statement that Jackson immediately showered and changed her clothes after returning home, further suggests that Jackson was the perpetrator and that the clothes she wore during the attack were likely to be found at her residence. In addition,

when considered in combination with the other evidence discussed above, the fact that a knife sheath was found at the hotel, but no knife, created a fair probability the knife used in the attack would also be found at Jackson's residence.

¶ 21. Consequently, even when Jackson's tainted statements are omitted from the search warrant affidavit, it still contains sufficient untainted evidence to support a finding of probable cause to search Jackson's residence. We therefore agree with the State that the circuit court erred by determining the affidavit did not establish probable cause for the search warrant.

## II. Inevitable discovery

¶ 22. In addition to the statements contained in the search warrant affidavit, the circuit court also suppressed Jackson's subsequent statements to police, including her statement telling them where to find the knife and the bloody clothing and shoes. Accordingly, the court found that, even if there was probable cause for the warrant to search Jackson's home, the knife, clothes, and shoes had to be suppressed as fruit of the poisonous tree. The State argues the circuit court erred because those items were admissible pursuant to the inevitable discovery doctrine.

¶ 23. The inevitable discovery doctrine provides that "evidence obtained during a search which is tainted by some illegal act may be admissible if the tainted evidence would have been inevitably discovered by lawful means." *State v. Lopez*, 207 Wis. 2d 413, 427, 559 N.W.2d 264 (Ct. App. 1996). To establish that the evidence would have been inevitably discovered, the State must demonstrate, by a preponderance of the

evidence, that: (1) there is a reasonable probability the evidence in question would have been discovered by lawful means but for the police misconduct; (2) the leads making the discovery inevitable were possessed by the government at the time of the misconduct; and (3) prior to the unlawful search the government also was actively pursuing some alternative line of investigation. *State v. Avery*, 2011 WI App 124, ¶ 29, 337 Wis. 2d 351, 804 N.W.2d 216. "Because the inevitable discovery doctrine is an exception to the exclusionary rule protecting Fourth Amendment interests . . . its application presents a constitutional question which we review de novo[.]" *Id.* (citations omitted).

¶ 24. The circuit court concluded the State had not met its burden to prove the knife, clothes, and shoes would have been inevitably discovered absent Jackson's statements. However, the court did not specifically address the three prongs of the inevitable discovery doctrine. Instead, the court determined the physical evidence should be suppressed because it would not be "good policy" to reward law enforcement "or provide them the benefit of the doubt when they violate somebody's constitutional rights for over six to seven hours by simply saying, well, we would have gotten it anyway through a back door." We appreciate the circuit court's concern and its disapproval of the methods used by the police in this case. However, on review of the issue, as a matter of law, we determine the State met its burden to establish the three prongs of the inevitable discovery doctrine by a preponderance of the evidence, and, under the circumstances, the purpose of the exclusionary rule is not met by suppressing the physical evidence.

¶ 25. Regarding the first prong of the inevitable discovery doctrine, we agree with the State that it is reasonably probable the knife, clothes, and shoes would have been discovered by lawful means but for the police misconduct. We have already determined that probable cause existed for the warrant to search Jackson's home and garage. Police were in the process of lawfully searching the home, pursuant to that warrant, when Jackson told them where to find the items in question. However, even if Jackson had not provided that information, the officers' testimony at the various suppression hearings demonstrates that police would have ultimately searched the garbage can where the knife, shoes, and clothes were located.

¶ 26. Detective Scott Callaway testified at least six officers were involved in the search of Jackson's residence. When they arrived, they divided into two groups. Callaway's group began by searching the basement, while the other group searched the upstairs portion of the house.

¶ 27. Callaway testified police planned to conduct an "[e]xtremely thorough" search of the house and garage. In particular, Callaway stated he told the other officers it was going to take a long time to search the garage because of all the bins and boxes inside. Callaway testified the search of the house entailed methodically dumping out garbage bags and going through boxes, drawers, and kitchen and bathroom cabinets. For example, in one basement bedroom, Callaway testified police found a large number of very large garbage bags, and they conducted a time-consuming examination of each bag that entailed dumping out each one and sifting through its contents.

¶ 28. Callaway further testified that, while the search of the basement was ongoing, the searchers

570

received a call from detective Kuehl suggesting they check "a garbage can near the door, in the garage." The officers who had been searching the basement then went outside and searched the two garbage cans closest to the garage door, but they found nothing. They then resumed searching the basement. Callaway testified Kuehl later arrived at the residence with Jackson at about 2:15 a.m. At that point, the search had been going on for about one hour and twenty-five minutes. Callaway testified his group had either just finished or was about to finish searching the basement when Kuehl arrived with Jackson, and the other group was still searching the upstairs portion of the house.

¶ 29. Detective Renkas testified he too was one of the officers who searched the basement of Jackson's home. Renkas explained that, because police were investigating a homicide, "[i]t was a very serious matter[,]" and they planned to be "very thorough" in their search of Jackson's residence. He further explained, "We were going to search everywhere and anywhere that we could search looking for relevant items that could be related to the incident and searching anywhere that the search warrant would allow us to search." Renkas testified he began by searching the master bedroom. He also testified he searched a closet area in the basement that contained several garbage bags, which took "some time" to examine.

¶ 30. While searching the basement, Renkas testified he and the other officers received information that a knife and clothing would be found in a garbage container "inside the garage by one of the doors." Renkas then left the basement and searched a garbage container inside the garage and another garbage bin outside the house, without finding anything relevant to the investigation. After searching those two garbage

571

containers, Renkas went back inside the house and continued searching the basement. He testified he did so "to keep everything systematic and as thorough as possible to make sure that we were doing a complete search of the residence." He testified he and the other officers planned to finish searching the garage later on. He confirmed that, aside from searching two garbage containers, police had not yet begun to search the garage before Kuehl arrived at the residence with Jackson.

¶ 31. Officer Russell Blahnik, who was also involved in the search of the basement, testified it took him more than an hour and a half to search the master bedroom. Blahnik stated it was important to look "anywhere and everywhere" in the areas he was searching. He further testified that, even if Jackson had not told police to look for the knife and bloody clothes in a garbage can in the garage, they would nevertheless have searched the garage "at some point" because the warrant authorized a search of the entire residence.

¶ 32. The officers' testimony demonstrates that they intended to conduct a thorough and methodical search of Jackson's house and garage that would have entailed examining every container or compartment that might have contained evidence of the crime. Thus, even if Jackson had not told police where to look, it is still reasonably probable that police would ultimately have discovered the knife, clothes, and shoes during their lawful search of the garage. Accordingly, we agree with the State that there is a reasonable probability the evidence in question would have been discovered by lawful means but for any police misconduct. *See Avery*, 337 Wis. 2d 351, ¶ 29.

¶ 33. Jackson argues the State has not shown the evidence would have been discovered "but for" the police misconduct because there is no evidence the State would have sought a warrant in the first place had Jackson not made the incriminating statements that were included in the search warrant affidavit. Jackson asserts that Renkas, who signed the affidavit, could not recall when the decision was made to seek a warrant to search the house. She therefore argues it is "impossible to determine" whether Jackson's statements contributed to the decision to seek a warrant.

¶ 34. We reject Jackson's argument because the first prong of the inevitable discovery doctrine does not require the State to show that information obtained in violation of *Miranda* had no influence on the decision to seek a warrant. Rather, the question is whether there is a reasonable probability the evidence in question would have been discovered by lawful means but for any police misconduct. *See Avery*, 337 Wis. 2d 351, ¶ 29. As discussed above, even absent Jackson's incriminating statements, the search warrant affidavit in this case contained ample evidence supporting a finding of probable cause to search Jackson's home. We agree with the State that "[i]t beggars belief to suggest that, possessing all of that information, none of which was the product of Jackson's custodial questioning, the police would not have sought a warrant to search Jackson's home."

¶ 35. The second prong of the inevitable discovery doctrine requires the State to demonstrate that the government possessed the leads making the discovery inevitable at the time of the misconduct. *See id.* On appeal, the State presents a persuasive argument that

this second prong is satisfied. Jackson fails to respond to the State's argument, and we therefore deem it conceded. *See Charolais Breeding Ranches, Ltd. v. FPC Secs. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (arguments not refuted are deemed conceded).

¶ 36. The third prong of the inevitable discovery doctrine requires a showing that, prior to the unlawful search, the government also was actively pursuing some alternative line of investigation. *Avery*, 337 Wis. 2d 351, ¶ 29. This requirement is satisfied when police are conducting a search of the premises pursuant to a lawfully issued warrant at the time of the unlawful activity. *See State v. Pickens*, 2010 WI App 5, ¶ 49, 323 Wis. 2d 226, 779 N.W.2d 1; *see also Avery*, 337 Wis. 2d 351, ¶ 33. That is precisely what occurred in this case—police were conducting a search of Jackson's residence pursuant to a lawfully issued warrant when Kuehl relayed tainted information from Jackson about where she had put the knife, clothes, and shoes.

¶ 37. We considered an analogous situation in *Lopez*. There, police were conducting a search of Lopez's residence, pursuant to a valid search warrant. *Lopez*, 207 Wis. 2d at 424, 426–27. During the search, officer John Gibbs located a locked freezer in the basement. *Id.* at 427. To avoid prying the freezer open, he asked Lopez where the key was located, and Lopez told him. *Id.* Lopez was in custody, but had not yet been given *Miranda* warnings. *Id.* When Gibbs opened the freezer, he found a large amount of marijuana. *Id.*

¶ 38. On appeal, Lopez argued the marijuana should have been suppressed because police would not have discovered it absent his tainted statement telling them where to find the key. *Id.* We rejected Lopez's

argument, concluding the evidence was admissible under the inevitable discovery doctrine. *Id.* at 427–28. We explained:

> Even without Lopez's statement regarding the key, the freezer would have been searched and the evidence therein seized. Prior to going upstairs to ask Lopez about the key, Gibbs had already located and decided to search the freezer as part of the search of the residence. In addition, Gibbs was actively pursuing his decision to search the freezer when he asked Lopez about the key. If he had not found the key, Gibbs testified that he would have pried the freezer open. Inevitably the contents, if any, of the freezer would have been discovered. Accordingly, we conclude that the trial court correctly denied Lopez's motion to suppress based on the doctrine of inevitable discovery.

*Id.* at 428.

¶ 39. The same rationale applies in this case. As in *Lopez*, the police here were actively pursuing another line of inquiry when they received the tainted information from Jackson about the location of the knife, clothes, and shoes—namely, they were conducting a thorough and methodical search of her residence pursuant to a valid warrant. And, as in *Lopez*, the officers would have found the evidence even without Jackson's tainted statement. In *Lopez*, the marijuana would have been discovered because officer Gibbs would have pried open the freezer. Here, the knife, clothes, and shoes would have been discovered due to the thorough and methodical nature of the search, to which the officers testified, and the fact that police planned to search the garage when they finished searching the house itself.

¶ 40. Jackson nevertheless argues the third prong of the inevitable discovery doctrine is not satis-

fied because the State has not shown police were actively pursuing "the leads making discovery inevitable" before the unlawful interrogation of Jackson began at 7:25 p.m.[7] We reject this argument, for two reasons.

¶ 41. First, the third prong of the inevitable discovery doctrine merely requires the State to show that "*prior to the unlawful search* the government also was actively pursuing some alternate line of investigation." *Avery*, 337 Wis. 2d 351, ¶ 29 (emphasis added). Here, the search only became unlawful when Jackson was brought to the house and showed police where to find the knife, clothes, and shoes. Before that point, police were actively pursuing an alternative line of investigation—i.e., a search pursuant to a valid warrant.

¶ 42. Second, even accepting Jackson's premise that police must have been actively pursuing the leads that made the discovery inevitable before the *Miranda* violation began at 7:25 p.m., the record demonstrates that they were doing so. Officers spoke to witnesses at the Road Star Inn when they initially responded to the hotel shortly after 1:25 p.m. Those witnesses gave

---

[7] As discussed above, the second prong of the inevitable discovery doctrine requires the State to show that the government possessed the leads making the discovery inevitable at the time of the misconduct. *See State v. Avery*, 2011 WI App 124, ¶ 29, 337 Wis. 2d 351, 804 N.W.2d 216. The third prong requires the State to show that the government was actively pursuing an alternative line of investigation prior to the unlawful search. *See id.* Here, Jackson argues the government was not "actively pursuing" the "leads making discovery inevitable" before the unlawful interrogation began. This argument appears to conflate elements of the second and third prongs. However, Jackson presents the argument as arising under the third prong, and we therefore address it in that context.

statements that at least arguably implicated Jackson in the crime. Then, police began questioning R.L.D.J. at about 5:00 or 5:30 p.m., and he eventually made statements that strongly suggested Jackson committed the offense. Based R.L.D.J.'s statements and those of the hotel witnesses, police would have had probable cause to obtain a warrant to search Jackson's residence, even if they had never questioned Jackson. Accordingly, even though R.L.D.J. did not disclose any information incriminating Jackson until 8:00 or 9:00 p.m., after the *Miranda* violation began, police were pursuing the leads that made the discovery of the physical evidence inevitable before the *Miranda* violation occurred.

¶ 43. For the foregoing reasons, we conclude as a matter of law that the State met its burden to establish all three prongs of the inevitable discovery doctrine by a preponderance of the evidence. However, Jackson argues that, even if all three prongs are satisfied, the doctrine "should not be applied in cases of intentional constitutional violations."[8] In support of this argument, Jackson relies on *State v. Knapp*, 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899. In *Knapp*, our supreme court considered whether physical evidence obtained as a direct result of an intentional *Miranda* violation should be suppressed as fruit of the poisonous tree. *Id.*, ¶ 2. The United States Supreme Court had previously held that the federal constitution did not require suppression under these circumstances. *Id.*, ¶ 1 (citing *United States v. Patane*, 542 U.S. 630 (2004)). However, applying the Wisconsin constitution,

---

[8] The State asserts it does not concede that the violation was intentional. However, it "acknowledges" the circuit court's finding that police intentionally violated Jackson's rights, and it "does not contend that that finding is clearly erroneous."

our supreme court held that, "[w]here physical evidence is obtained as the direct result of an intentional *Miranda* violation," the evidence must be suppressed. *Id.*, ¶ 2.

¶ 44. The *Knapp* court reasoned that, in the case of an intentional *Miranda* violation, the "strong need for deterrence" overcomes "the social costs of excluding evidence[.]" *Id.*, ¶ 74. The court cited two policy factors supporting this conclusion. First, the court stated failing to suppress physical evidence obtained as a direct result of an intentional *Miranda* violation would " 'minimize the seriousness of the police misconduct producing the evidentiary fruits, breed contempt for the law, and encourage the type of conduct that *Miranda* was designed to prevent[.]' " *Id.*, ¶ 75 (quoted source omitted). Second, the court stated suppression was necessary to "preserv[e] judicial integrity" because "[w]hen law enforcement is encouraged to intentionally take unwarranted investigatory shortcuts to obtain convictions, the judicial process is systematically corrupted." *Id.*, ¶¶ 79, 81.

¶ 45. *Knapp* did not discuss or apply the inevitable discovery doctrine. Moreover, in *Knapp*, it was undisputed that the physical evidence was obtained as the "direct result" of an intentional *Miranda* violation. *See Knapp*, 285 Wis. 2d 86, ¶ 20. In other words, in *Knapp*, there was no evidence the police would have obtained the physical evidence had the *Miranda* violation not occurred. Conversely, in this case, we have already determined that the knife, clothes, and shoes would have been inevitably discovered by lawful means, notwithstanding the police misconduct. Under these circumstances, the twin policy goals identified in *Knapp* are not served by suppression and are in fact outweighed by the detrimental effect of excluding

important physical evidence. *See id.*, ¶ 23 (The exclusionary rule "is not absolute, but rather is connected to the public interest, which requires a balancing of the relevant interests."). Jackson has already received a remedy for the *Miranda* violations that occurred in this case—her inculpatory statements were suppressed, and they were also excised from the search warrant affidavit for purposes of determining whether the affidavit established probable cause to search her residence. No additional remedy is required.

¶ 46. Jackson cites cases from other jurisdictions that have concluded the inevitable discovery doctrine does not apply to evidence discovered as a result of intentional constitutional violations. *See State v. Holly*, 833 N.W.2d 15, 31–33 (N.D. 2013); *Smith v. State*, 948 P.2d 473, 481 (Alaska 1997); *Commonwealth v. Sbordone*, 678 N.E.2d 1184, 1190 (Mass. 1997). However, not all courts have embraced that view. The Sixth Circuit, for example, has rejected the argument that a court must "consider the severity and intentionality of the government's constitutional violation in deciding whether the inevitable discovery rule applies." *United States v. Alexander*, 540 F.3d 494, 502–03 (6th Cir. 2008). The court explained that such a rule would run contrary to *Nix v. Williams*, 467 U.S. 431 (1984), the United States Supreme Court decision that recognized the inevitable discovery doctrine:

> [M]ost importantly, Alexander's argument gives short shrift to the *Nix* Court's determination that the inevitable discovery rule applies even if there were police misconduct. In evaluating whether exclusion is proper, courts must "evaluate the circumstances of th[e] case in the light of the policy served by the exclusionary rule." It is true that the "rule is calculated to prevent, not repair. Its purpose is to deter—to compel respect

for the constitutional guaranty in the only effective way—by removing the incentive to disregard it." However, the *Nix* Court was very clear that despite these purposes of the exclusionary rule, the government cannot be made worse off because of misconduct than it would have been if the misconduct had not occurred. . . . Thus, [law enforcement's] allegedly illegal conduct cannot make the government worse off than it would have been had [law enforcement] fully respected Alexander's rights.

*Alexander*, 540 F.3d at 503–04; *see also Nix*, 467 U.S. at 445 (prosecution need not prove the absence of bad faith for the inevitable discovery doctrine to apply because such a requirement "would put the police in a worse position than they would have been in if no unlawful conduct had transpired" and "wholly fails to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice").

¶ 47. Here, even if police had never spoken to Jackson and had never violated her rights under *Miranda*, they still would have obtained a warrant to search her residence and would have inevitably discovered the crucial physical evidence linking her to Whitlow's death. Under these circumstances, suppressing the physical evidence would serve little purpose and would actually place the State in a worse position than it would have been in absent the misconduct, contrary to the rationale of *Alexander* and *Nix*. This further distinguishes the instant case from *Knapp*, where suppression did not place the government in a worse position than it would have been in absent the *Miranda* violation.

¶ 48. We therefore reject Jackson's argument that the inevitable discovery doctrine does not apply in this case because police intentionally violated her *Miranda* rights. We acknowledge that the officers' actions during the interrogation of Jackson were reprehensible.[9] We do not in any way condone their conduct. However, for the reasons discussed above, we nevertheless conclude suppression of the physical evidence that was derived, in part, from the officers' misconduct is not an appropriate remedy because the evidence would have been inevitably discovered using lawful means.

By the Court.—Order reversed.

---

[9] The circuit court's apparent outrage over such conduct is thus understandable.