SHIRLEY S. ABRAHAMSON, J.
¶ 93. (.dissenting). Unlike the majority opinion, I would suppress the physical evidence obtained at Mastella Jackson's home following law enforcement officers' deliberate violations of Jackson's Miranda rights.
¶ 94. The majority decides this Miranda case in the same month as the fiftieth anniversary of Miranda v. Arizona, 384 U.S. 436 (June 13, 1966).[1] Miranda is perhaps the best-known criminal law decision of the United States Supreme Court.
¶ 95. The Miranda warnings are celebrated as a shield against compelled self-incrimination and violations of criminal suspects' constitutional rights. Mi *729 randa warnings stem from the very constitution our law enforcement officers are sworn to protect and defend.[2]
¶ 96. Moreover, Miranda warnings are "embedded in routine police practice" and "have become part of our national culture."[3]
¶ 97. Even fictional TV law enforcement officers like Dragnet's Detective Joe Friday and Law and Order's officers give Miranda warnings. If you missed the warnings in the original series you will hear them again and again in the reruns.[4]
¶ 98. The circuit court developed an extensive record about Jackson's interrogation, including testimony and audio recordings.[5]
¶ 99. Jackson was brought to the Grand Chute Police Department shortly after 4:30 PM. She was alone in a room for about two hours. Grand Chute Police officers began questioning Jackson at about 6:30 PM, and the circuit court found Jackson was in custody (i.enot free to leave) at 7:25 PM. Nevertheless, the interrogation continued for more than five hours before officers advised Jackson of her Miranda rights.[6]
¶ 100. During the interrogation, Jackson was in pain and needed her prescription medication. Several *730 times during the officers' questioning, she asked "to leave," "to go home," "not to say anything," and "to talk at a different time."[7] Despite the fact that Jackson was told at the outset, "[Yjou're not under arrest or, you know, you're free to go, you know,"[8] Jackson's requests to leave and not to speak went unheeded, all contrary to federal constitutional law.
¶ 101. The circuit court issued a comprehensive ruling suppressing the statements made during the interrogation.[9] The circuit court concluded that the failure to read Jackson her Miranda warnings was an intentional violation of Jackson's constitutional rights. The circuit court strongly condemned the officers and detectives for giving incredible testimony[10] and deliberately violating Jackson's rights.
¶ 102. The circuit court judge stated that when he considered the interrogation he "became sick to my stomach literally .... [T]his is textbook interrogation of what not to do if you want to be doing good police work and get stuff admitted in during a hearing."
¶ 103. The circuit court went on to denounce the officers' conduct as follows:
I've never seen a case, been part of a case, or heard of a case that's worse than this in terms of what the police officers did in that interrogation room. . .. [T]his is just a clear violation of somebody's rights over a long period of time involving many different officers with lots of opportunities to have one of them step up and say, hey, this is not the way we need to do this.
*731 ¶ 104. Compounding the duplicity of the Miranda violation, when the officers finally read Jackson her rights, the detective assured Jackson that her rights would not be violated:
Can I, can I read [Miranda warnings] to you first because I technically can't get into a lot of stuff without until I advise you of these and you decide whether or not you want to talk to me anymore, OK because I can't violate your rights, do you know what I mean? So can I read this to you and then you decide whether or not you want to talk to me because I can't really get into any in depth conversation with you until you either tell me yes or no that you're willing to talk to me. So let me read this to you and then you decide what you want to answer and we'll go from there and then anything I can answer for you I'll answer, presuming you want to talk to me. Sound fair?[11]
¶ 105. After hearing the Miranda warnings Jackson asked: "So earlier, when you, when you wouldn't let me leave . . . ." The detective cut her off.
¶ 106. Contrary to what the detective told Jackson, Miranda warnings are not a technicality — they are a constitutionally required "shield that protects against compelled self-incrimination."[12] We have recognized that Miranda's shield against compelled self-incrimination is "made of substance, not tinsel," and "[a]ny shield that can be so easily . . . cast aside by the very people we entrust to enforce the law fails to serve its own purpose, and is in effect no shield at all."[13]
¶ 107. The court of appeals branded "the officers' actions during the interrogation of Jackson [as] repre *732 hensible."[14] The majority opinion agrees that the circuit court's and court of appeals' condemnation of the police conduct was "warranted and appropriate."[15]
¶ 108. Our society asks law enforcement officers to perform an extraordinarily difficult and dangerous job. We rely on them to maintain public safety and defend the rule of law. And most law enforcement officers perform admirably, placing themselves in harm's way to protect the rest of us.
¶ 109. To enable them to do their important work, society entrusts law enforcement officers with enormous power. The power of law enforcement officers, however, like the power of all government officials, is not unchecked.
f 110. Our court has forcefully declared: "Just as we will not tolerate criminal suspects to lie to the police under the guise of avoiding compelled self-incrimination, we will not tolerate the police deliberately ignoring Miranda's rule as a means of obtaining inculpatory physical evidence."[16] Disregard for the rule of law, especially by those sworn to protect and defend it, breeds distrust, suspicion, and contempt in the community, and undermines the important and legitimate activities of law enforcement.[17]
*733 ¶ 111. In the instant case, by intentionally flouting Jackson's rights, law enforcement officers obtained incriminating statements from Jackson and took a shortcut to accelerate the discovery of incriminating physical evidence in Jackson's home — bloody shoes, clothes, and a knife Jackson allegedly used to kill her husband.[18] Although police searched Jackson's home for incriminating evidence pursuant to a warrant, the warrant was based in part on statements made during Jackson's unlawful interrogation, and the shoes, clothes, and knife were found only after officers brought Jackson (in custody) to her home at about 2:15 AM to point out the objects.
¶ 112. The incriminating statements Jackson made before and after she was given Miranda warnings remain suppressed. The suppression of Jackson's statements (including those statements made when she was in her home) is not challenged by the State. Rather, the State challenges only the suppression of the physical evidence seized at Jackson's home.
¶ 113. The majority opinion agrees with the court of appeals' decision reversing the circuit court's suppression of the incriminating physical evidence.
¶ 114. A court is clearly saddened and disappointed to observe and write about intentional police misconduct violating a constitutional right. A court's expression of commitment to the Constitution rings hollow, however, if the court allows Miranda's shield *734 against compelled self-incrimination to be cast aside without providing a remedy. True, Jackson's incriminating statements remain suppressed, but the majority does not offer either Jackson or the people of the State a remedy for the intentional, unwarranted, and unconstitutional shortcut police took in discovering the incriminating physical evidence. The remedy I propose, suppression of the physical evidence, has shortcomings, but suppression further deters intentional violations of Miranda, fulfilling "one purpose of the exclusionary rule[, which] is to deter such shortcuts . . . ." See 6 Wayne R. LaFave, Search & Seizure § 11.4(a), at 344-45 (5th ed. 2012). Not granting a remedy for this shortcut is not an acceptable option. See ¶¶ 136, 138-143, infra.
¶ 115. I conclude that to ensure that "those we entrust to enforce the law [do not] intentionally subvert a suspect's constitutional rights,"[19] suppression of the physical evidence obtained at Jackson's home is necessary. In concluding that suppression of the physical evidence is necessary, I adhere to the reasoning in State v. Knapp, 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899, which held that physical evidence obtained as a direct result of an intentional violation of Miranda is inadmissible under Article I, Section 8 of the Wisconsin Constitution.
¶ 116. In refusing to suppress the physical evidence obtained at Jackson's home, the majority opinion applies the inevitable discovery doctrine, an exception to the exclusionary rule.[20] I disagree with applying the inevitable discovery doctrine in the instant case. I would hold, based on Knapp, that Article *735 I, Section 8 of the Wisconsin Constitution does not allow the State to rely on the inevitable discovery doctrine in cases of intentional police violations of Miranda.
¶ 117. I also have concerns about the majority opinion's approach to the substantive aspects of the inevitable discovery doctrine. I discuss these concerns in Part II of this dissent.
¶ 118. For the reasons set forth, I dissent and write separately.
I
¶ 119. The physical evidence should be suppressed under Article I, Section 8 of the Wisconsin Constitution, which provides (in relevant part):
(1) No person . . . may be compelled in any criminal case to be a witness against himself or herself.
¶ 120. The text of the relevant portion of the Fifth Amendment to the United States Constitution is similar:
No person . . . shall be compelled in any criminal case to be a witness against himself....
¶ 121. Although the text of Article I, Section 8 and the Fifth Amendment are similar, we need not interpret our Wisconsin Constitution in lock-step with the interpretation of the United States Constitution.[21]
*736 ¶ 122. In interpreting the Wisconsin Constitution, this court should take the position espoused by Wisconsin Supreme Court Justice Abram Smith in 1855:
In view of the obligations imposed upon me, or rather voluntarily assumed by me,... in my present position, I have felt bound to sustain that fundamental law— the constitution of the state, according to its true intent and meaning. That is the great charter of our rights, to which the humblest may at all times appeal, and to which the highest must at all times submit.
Let us then look to that constitution, adopted by the people of Wisconsin, and endeavor to ascertain its true intent and meaning....
The people then made this constitution, and adopted it as their primary law. The people of other states made for themselves respectively, constitutions which are construed by their own appropriate functionaries. Let them construe theirs — let us construe, and stand by ours.
Att'y Gen. ex rel. Bashford v. Barstow, 4 Wis. 567 (*567), 785 (*757-58) (1855) (emphasis in original).
f 123. I turn to Knapp, which interpreted Article I, Section 8 of the Wisconsin Constitution. The Knapp court broke from the United States Supreme Court's interpretation of the Fifth Amendment, holding that when "physical evidence is obtained as the direct result of an intentional Miranda violation, we *737 conclude that [Article I, Section 8 of] our constitution requires that the evidence must be suppressed."[22]
¶ 124. Let's begin with the facts in Knapp. The defendant, Knapp, was a parolee who was seen with a woman who was later murdered.[23] Based on a parole violation, an officer went to the defendant's house to apprehend him.[24] When the officer arrived, he told Knapp that he had to go to the police station, but never read him the Miranda warnings.[25] Before leaving Knapp's house, the officer questioned him about what clothes he was wearing when he was seen with the victim.[26] After Knapp pointed out the clothes, the officer seized them and took Knapp to the police station.[27] Police later discovered the victim's blood on the sleeve of Knapp's sweatshirt.[28]
¶ 125. Knapp argued that the sweatshirt should be suppressed based on the officer's intentional violation of Miranda. The court agreed, relying on Article I, Section 8 of the Wisconsin Constitution and the deliberate violations of Miranda at issue. Although the court recognized that the exclusionary rule is not absolute, the court concluded that the need to deter intentional violations of individuals' constitutional rights and preserve the integrity of the judicial system required the application of the exclusionary rule when physical evidence is obtained as a direct result of an intentional Miranda violation.[29]
*738 ¶ 126. Knapp differs from the instant case in that no search warrant was issued in Knapp.[30] The officer in Knapp was not pursuing other means of searching the defendant's house at the time the intentional violation of Miranda occurred.[31] Thus, the Knapp court described the location of the physical evidence as a direct result of the Miranda violation. In contrasting the instant case with Knapp, the court of appeals stated that "the knife, clothes, and shoes [in the instant case] would have been inevitably discovered by lawful means, notwithstanding the police misconduct."[32] The "lawful means" to which the court of appeals refers is the search of Jackson's home pursuant to the warrant.
¶ 127. Like the court of appeals, the majority opinion concludes that the physical evidence inevitably would have been discovered pursuant to the search warrant.[33] Perhaps. But the search warrant was based in part on Jackson's suppressed statements obtained in violation of Miranda.
¶ 128. To validate the search warrant, the court of appeals and majority opinion have to excise Jackson's suppressed statements.[34] Furthermore, although law enforcement had a search warrant, the physical evidence was found only after the officers took Jackson *739 to her home and asked her to show them where she discarded the clothes, shoes, and knife. On these facts, the circuit court suppressed the physical evidence.
¶ 129. Whether locating the physical evidence in the instant case fits the verbal formula in Knapp of a "direct" result of a Miranda violation, locating the physical evidence is very much related to and can be described as a direct outgrowth of Jackson's illegal interrogation before and after the Miranda warnings. By the time Jackson was taken to her home it was about 2:15 AM, and Jackson had been in custody and subject to questioning for more than seven hours. The circuit court suppressed Jackson's statements, including statements she made when the officers took her to her home and had her locate the physical evidence.
¶ 130. In suppressing Jackson's statements, the circuit court relied on Missouri v. Seibert, 542 U.S. 600 (2004),[35] and concluded that Jackson's statements were involuntary under the circumstances.[36] The direct causal connection between Jackson's illegally ob *740 tained (and properly suppressed) statements and the discovery of the physical evidence is clear and undeniable.
¶ 131. I do not view any supposed difference between Knapp and the instant case as sufficient to depart from the reasoning and holding of Knapp. Relying on the rhetorical distinction between evidence obtained as a "direct" (versus "indirect?") result of a violation of Miranda distorts the facts of the instant case and the policy underlying Miranda and Knapp. The majority opinion's decision allowing the use of the inevitable discovery doctrine to avoid suppression of evidence that was concededly obtained as a direct outgrowth of a coercive, deliberate, illegal interrogation allows the inevitable discovery doctrine to swallow Miranda, the exclusionary rule, and Knapp.
¶ 132. Moreover, I disagree with the majority opinion's holding that good faith by law enforcement is not a prerequisite for relying on the inevitable discovery doctrine. I view good faith in the instant case as an essential element for the application of the inevitable discovery doctrine.
¶ 133. In disregarding the law enforcement officers' bad faith, the majority opinion relies on Nix v. Williams, 467 U.S. 431 (1984), the famous (or "infamous"[37]) Christian Burial Case. In Nix, the United States Supreme Court concluded that requiring "that the prosecution. . . prove the absence of bad faith would. . . withhold D from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity" and would "put *741 the police in a worse position that they would have been in if no unlawful conduct had transpired."[38]
¶ 134. Nix has spawned significant criticism. For example, Professor Wayne LaFave's treatise on criminal law (referenced by the majority opinion) states:
Because one purpose of the exclusionary rule is to deter. . . shortcuts, there is much to be said for the proposition that the "inevitable discovery" rule should be applied only when it is clear that "the police officers have not acted in bad faith to accelerate the discovery" of the evidence in question.
6 Wayne R. LaFave, Search & Seizure, § 11.4(a) at 344-46 (5th ed. 2012) (quoting Brian S. Conneely & Edmond P. Murphy, Comment, Inevitable Discovery: The Hypothetical Independent Source Exception to the Exclusionary Rule, 5 Hofstra L. Rev. 137,160 (1976)).[39] *742 Professor LaFave does not consider compelling the argument that" 'if we hadn't done it wrong, we would have done it right6 LaFave, Search & Seizure, § 11.4(a), at 347 (quoted source omitted).
¶ 135. The majority asserts that the uncertainty law enforcement officers face over the applicability of the inevitable discovery doctrine when they intentionally violate an individual's rights justifies application of the inevitable discovery doctrine.[40] No empirical evidence supports this bare assertion. We are in an era recognizing the importance of evidence-based decision making, but all the majority musters is conjecture.
¶ 136. The majority also emphasizes the "societal costs" of applying the exclusionary rule in instances in which evidence inevitably would have been discovered by lawful means.[41] To be sure, there are such costs; however, other proposed remedies for law enforcement misconduct present other problems.[42] But not granting a remedy in the instant case is not an *743 acceptable option. Nowhere in the majority's calculus is the cost to judicial integrity and deterrence of allowing the use of evidence obtained by flagrant and reprehensible police wrongdoing.
¶ 137. In Knapp, two key factors led this court to conclude that Article I, Section 8 required the suppression of evidence obtained as a direct result of a violation of Miranda. First, failing to suppress such evidence would " 'minimize the seriousness of the police misconduct producing the evidentiary fruits, breed contempt for the law, and encourage the type of conduct that Miranda was designed to prevent, especially where the police conduct is intentional, as it was here.' "[43] Second, allowing the State to benefit from ill-gotten gains undermines the integrity of the judicial system.[44]
¶ 138. I agree with those who have written that "the need to deter is greater when the illegal activity of the police is deliberate. Society needs to make clear to the enforcers of our laws that when they deliberately violate constitutional principles a penalty must be paid."[45]
¶ 139. Thus, three states, Alaska, Massachusetts, and North Dakota, each relying on a state law or constitution, have narrowed the inevitable discovery doctrine to cases in which police do not knowingly or intentionally violate a suspect's rights. See, e.g., Commonwealth v. Mattier, 50 N.E.3d 157, 167 (Mass. 2016) (citing Commonwealth v. Sbordone, 678 N.E.2d 1184, 1190 (Mass. 1997)); State v. Holly, 833 N.W.2d 15, 33 *744 (N.D. 2013) (citing State v. Phelps, 297 N.W.2d 769, 775 (N.D. 1980)); Smith v. State, 948 P.2d 473, 481 (Alaska 1997); see also United States v. Madrid, 152 F.3d 1034, 1041 (8th Cir. 1998) (declaring that courts are not required to apply the inevitable discovery doctrine "without regard to the severity of the police misconduct"); but see State v. Garner, 417 S.E.2d 502, 510-11 (N.C. 1992) (rejecting this view).
¶ 140. As the Massachusetts Supreme Judicial Court put it:
We think the severity of the constitutional violation is critical in deciding whether to admit evidence that it is shown would inevitably have been discovered. . . . Bad faith of the police, shown by such activities as conducting an unlawful search in order to accelerate discovery of the evidence, will be relevant in assessing the severity of any constitutional violation.
Commonwealth v. O'Connor, 546 N.E.2d 336, 340 (Mass. 1989) (internal citations omitted).
¶ 141. The concerns raised by these cases and commentators are echoed by our own decision in Knapp, and are as salient in the instant case as they were in Knapp. The circuit court, the court of appeals, the majority opinion, and I all agree that the violations of Jackson's rights in the instant case were intentional, deliberate, unjustifiable, and profoundly troubling. I am troubled that the majority opinion, despite its recognition of law enforcement's wrongdoing, minimizes the seriousness of the wrongdoing and in effect may encourage future violations by allowing law enforcement to fall back on the inevitable discovery doctrine even in unfortunate cases like this one.
¶ 142. Justice Louis Brandeis got it right in Olmstead v. United States, 277 U.S. 438, 468 (1928) (Brandeis, J., dissenting):
*745 OFFICIAL WISCONSIN REPORTS Supreme Court
Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.
To declare that in the administration of the criminal law the ends justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.
¶ 143. Accordingly, I would adhere to our reasoning in Knapp, not the United States Supreme Court's reasoning in Nix, and hold that under Article I, Section 8 of the Wisconsin Constitution, the State may not rely on the inevitable discovery doctrine in cases in which law enforcement officers acted in bad faith by deliberately failing to give Miranda warnings.
II
¶ 144. I have reservations about the majority opinion's discussion of the substantive aspects of the inevitable discovery doctrine. The majority opinion reformulates the three-prong analysis of the inevitable discovery doctrine applied by the court of appeals. Reformulating the analysis of the inevitable discovery doctrine was not an issue raised or discussed by the parties. Instead of the normal progression of issues being narrowed or limited on appeal, the majority opinion expands the issues.
¶ 145. True, as the majority opinion points out, some exceptions to the court of appeals' formulation of the inevitable discovery doctrine may be necessary, but the court of appeals' three-prong analysis (unlike the
745
*746 majority's free-flowing inevitability analysis) provides important guidance to circuit courts and the court of appeals.[46]
¶ 146. Additionally, given the focus of the inevitable discovery doctrine on whether evidence inevitably would have been discovered by lawful means, I question the majority opinion's reliance on the "preponderance of the evidence" burden of proof.[47] "Proof by a preponderance of the evidence would require a mere showing that [an occurrence] is more likely than not. . . ,"[48]
¶ 147. An inevitability is defined as something that is "sure to happen."[49] There is an obvious tension in requiring proof that an event is "more likely than not to happen" when the fact to be proved is that the event is "sure to happen."[50]
*747 ¶ 148. I would follow the practice of other courts and hold the State to the heightened "clear and convincing evidence" burden of proof in inevitable discovery cases. Increasing the burden of proof has both practical and symbolic significance, impressing upon the factfinder the importance of the decision and reducing the chance that hypothetical findings of inevitability will swallow the exclusionary rule. See, e.g., State v. Rodrigues, 286 P.3d 809, 823 (Haw. 2012) (quoting State v. Lopez, 896 P.2d 889, 907 (Haw. 1995)); State v. Smith, 54 A.3d 772, 786-87 (N.J. 2012) (citing State v. Sugar, 495 A.2d 90, 104 (N.J. 1985)); Smith v. State, 948 P.2d 473, 479 (Alaska 1997); see also Nix, 467 U.S. at 459 (Brennan, J., dissenting) (asserting that proof of the inevitability of discovering evidence by lawful means should be shown by clear and convincing evidence).
¶ 149. For the reasons set forth, I dissent and write separately.
¶ 150. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

 The American Bar Association used the fiftieth anniversary of the Miranda decision as this year's Law Day (May 1) theme.
Minnesota Judge Kevin S. Burke wrote in celebration of Law Day 2016 and the Miranda decision as follows: "Our criminal justice system has faults, but the Miranda decision 50 years later is the embodiment of what President Eisenhower hoped for in creating Law Day: a democracy that chooses not force, but the rule of law." Judge Kevin S. Burke, Choosing the rule of law: a tribute to the Miranda decision, MinnPost (Apr. 29, 2016), https://www.minnpost.com/community-voices/2016 /04/choosing-rule-law-tribute-miranda-decision.

 See Dickerson v. United States, 530 U.S. 428, 438 (2000) ("Miranda is a constitutional decision . . ..").

 See Dickerson, 530 U.S. at 443.

 See George C. Thomas III & Richard A. Leo, The Effects of Miranda v. Arizona: "Embedded" in Our National Culture?, 29 Crime & Just. 203,246 (2002) (" [I]t is because of these shows and the mass media more generally — not the police, the legal system, or Supreme Court doctrine — that Miranda has become so much a part of our national culture.").

 Majority op., ¶ 35.

 Majority op., f 2.

 Majority op., f ¶ 22, 25; see also ¶ 27.

 Majority op., f 18.

 Majority op., ¶ 36.

 Majority op., ¶ 36.

 Majority op., ¶ 27 (emphasis added).

 State v. Knapp, 2005 WI 127, ¶ 72, 285 Wis. 2d 86, 700 N.W.2d 899.

 Knapp, 285 Wis. 2d 86, ¶ 72.

 State v. Jackson, 2015 WI App 49, ¶ 48, 363 Wis. 2d 554, 866 N.W.2d 768.

 See majority op., f 69 ("[T]he circuit court and court of appeals, respectively, rebuked officers for 'flagrant' and 'reprehensible' violations of Jackson's rights — rebukes, we believe, that were warranted and appropriate.").

 Knapp, 285 Wis. 2d 86, ¶ 72.

 "’When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law. When such transgressions are acknowledged yet forgiven by *733 the courts, we endorse and invite their repetition." United States v. Olsen, 737 F.3d 625, 632 (9th Cir. 2013) (Kozinski, C.J., joined by four judges, dissenting from denial of rehearing en banc); see also Knapp, 285 Wis. 2d 86, ¶¶ 75, 79.

 See ¶ 134, infra (quoting Professor LaFave's criticism of a court's using the inevitable discovery doctrine under these circumstances).

 Knapp, 285 Wis. 2d 86, ¶ 83.

 See majority op., ¶ 92.

 See Knapp, 285 Wis. 2d 86, ¶¶ 59-62; see also Knapp, 285 Wis. 2d 86, ¶¶ 84-94 (Crooks, J., concurring); William J. Brennan, Jr., State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489, 500 (1977) ("[W]hile this results in a divergence of meaning between words which are the same in both federal and state constitutions, the system of *736 federalism envisaged by the United States Constitution tolerates such divergence where the result is greater protection of individual rights under state law than under federal law ....") (quoted source omitted).

 Knapp, 285 Wis. 2d 86, ¶ 2 (emphasis added).

 Knapp, 285 Wis. 2d 86, ¶ 5.

 Knapp, 285 Wis. 2d 86, ¶¶ 6-7.

 Knapp, 285 Wis. 2d 86, ¶ 7.

 Knapp, 285 Wis. 2d 86, ¶ 8.

 Knapp, 285 Wis. 2d 86, ¶ 8.

 Knapp, 285 Wis. 2d 86, ¶ 12.

 See Knapp, 285 Wis. 2d 86, ¶¶ 74-75, 79, 83.

 Jackson, 363 Wis. 2d 554, ¶ 45. Knapp does not involve the inevitable discovery doctrine. The State in Knapp might have been able to argue that some chain of events or alternative line of investigation demonstrated that law enforcement would have inevitably discovered the physical evidence.

 See Knapp, 285 Wis. 2d 86, ¶¶ 7-9.

 Jackson, 363 Wis. 2d 554, ¶ 45.

 See majority op., ¶ 75.

 See majority op., f ¶ 75-76; Jackson, 363 Wis. 2d 554, ¶¶ 17-18.

 In Missouri v. Seibert, 542 U.S. 600 (2004), the United States Supreme Court addressed whether suppression of evidence is necessary for statements made after Miranda warnings are given if, before the officers gave the suspect Miranda warnings, an unconstitutional interrogation had taken place. The court held that such statements must be suppressed despite "the midstream recitation of warnings after interrogation and unwarned confession" in order to effectively comply with Miranda. Seibert, 542 U.S. at 604.

 The State did not challenge these aspects of the circuit court's decision. Indeed the State accepted for purposes of its brief that "Jackson's statements to the police were obtained in violation of Miranda and were involuntary, [and] that the police improperly relied on information obtained from Jackson to locate [the physical evidence]." Brief of Plaintiff-Appellant at 11.

 See Knapp, 285 Wis. 2d 86, ¶ 30.

 Nix v. Williams, 467 U.S. 431, 445 (1984); see also majority op., ¶¶ 71—72.

 For criticism of and proposed limitations on the inevitable discovery doctrine, see also, e.g., Eugene L. Shapiro, Active Pursuit, Inevitable Discovery, and the Federal Circuits: The Search for Manageable Limitations Upon an Expansive Doctrine, 39 Gonz. L. Rev. 295 (2003-04) (noting the expansiveness of the inevitable discovery doctrine and describing a significant split among the federal circuits concerning whether the inevitable discovery doctrine requires a separate and independent investigation be ongoing at the time of the constitutional illegality); William C. Heffernan, Foreword: The Fourth Amendment Exclusionary Rule as a Constitutional Remedy, 88 Geo. L.J. 799, 856-57 (2000) (exploring alternatives to the exclusionary rule and arguing that the inevitable discovery doctrine should require (1) an independent investigation be underway when a tainted chain of events is unfolding; and (2) a demonstration by the State by clear and convincing evidence that the independent investigation would produce the same information discovered were it not for the illegality); George C. Thomas III & Barry S. Pollack, Balancing *742 the Fourth Amendment Scales: The Bad-Faith "Exception" to Exclusionary Rule Limitations, 45 Hastings L.J. 21, 57 (1993) (noting the "inherently speculative nature" of the inevitable discovery doctrine and suggesting there is less reason to engage in that speculation where evidence was obtained through a bad faith violation of a defendant's rights); John E. Fennelly, Refinement of the Inevitable Discovery Exception: The Need for a Good Faith Requirement, 17 Wm. Mitchell L. Rev. 1085, 1100-06 (1991) (arguing that the courts should not favor intentional police lawbreaking by affording the misconduct the same treatment given honest mistakes).

 Majority op., ¶ 71 (quoting Nix, 467 U.S. at 445) (alteration in original).

 Majority op., ¶¶ 46, 55.

 See generally Heffernan, supra note 39, at 818-19, 848-51, 854-58 (discussing the exclusionary rule's limitations and advantages as a remedy and exploring alternative remedies for constitutional violations).

 Knapp, 285 Wis. 2d 86, ¶ 75 (quoted source omitted).

 Knapp, 285 Wis. 2d 86, ¶ 79.

 Steven P. Grossman, The Doctrine of Inevitable Discovery: A Plea for Reasonable Limitations, 92 Dick. L. Rev. 313, 356 (1988) (emphasis added).

 See majority op., f ¶ 62-66.

 See majority op., ¶ 66.

 In re Commitment of West, 2011 WI 83, ¶ 80, 336 Wis. 2d 578, 800 N.W.2d 929.

 Merriam-Webster's Learner's Dictionary, Inevitable (2008).

 See United States v. Heath, 455 F.3d 52, 59 n.6 (2d Cir. 2006) (describing the "semantic puzzle" of "using the preponderance of the evidence standard to prove inevitability" and concluding that it was sufficient to "note the difference between proving by a preponderance that something would have happened and proving by a preponderance of the evidence that something would inevitably have happened") (quoted source omitted; 6 Wayne R. LaFave, Search and Seizure, § 11.4(a) at 359-61 (5th ed. 2012) ("A 'majority of the courts that have utilized the exception have tended to define the necessary probability in terms of 'would,' which is the constitutional standard ... .' 'It is not enough to show the evidence 'might' or 'could' have been otherwise obtained.'") (internal citations, footnotes, and quotation marks omitted).